**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juan Ramon MATTA–BALLESTEROS,**
**Defendant–Appellant.**

No. 91–50336.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 4, 1993.

Submission Vacated April 7, 1994.

Resubmitted June 6, 1994.

Decided Dec. 1, 1995.

Martin R. Stolar, Michael J. Burns, New York City, for defendant-appellant.

Manuel A. Medrano, John L. Carlton, Assistant United States Attorneys; Los Angeles, CA, and Sean Connelly, Joseph D. Wilson, United States Department of Justice; Washington, DC, for plaintiff-appellee.

Before: BROWNING, POOLE, and JOHN T. NOONAN, Jr., Circuit Judges.

Concurrence by Judge NOONAN.

POOLE, Circuit Judge:

Appellant Juan Ramon Matta–Ballesteros appeals his convictions following jury trial on the following charges: (1) committing a crime of violence in aid of racketeering in violation of 18 U.S.C. § 1959; (2) conspiring to kidnap a federal agent engaged in his official duties in violation of 18 U.S.C. § 1201(c); and (3) kidnapping a federal agent engaged in his official duties in violation of 18 U.S.C. § 1201(a)(5). Matta–Ballesteros contends that the district court lacked jurisdiction over him and committed various reversible errors during his trial. We reject his arguments and affirm his convictions.

## I

Rafael Caro–Quintero, Ernesto Fonseca–Carrillo, Miguel Angel Felix–Gallardo, Ruben Zuno–Arce, Manuel Ibarra, Miguel Aldana and Javier Barba–Hernandez, all Mexican nationals, jointly operated a marijuana and cocaine trafficking enterprise centered in Guadalajara, Mexico.[1] The enterprise operated marijuana ranches in various Mexican locations.

Matta–Ballesteros, a Honduran, became involved with the enterprise in 1982 or 1983, and attended meetings where drug trafficking plans were discussed and decided. Felix–Gallardo and Matta–Ballesteros imported large amounts of cocaine into the United States on a number of occasions. At one point during their cocaine trafficking, Matta–Ballesteros and Felix–Gallardo grossed over $5 million a week from this enterprise.

During 1984, the Drug Enforcement Administration (DEA) made several significant seizures of marijuana and cocaine which resulted in substantial losses for the enterprise. At a gathering held after the baptism of Barba–Hernandez' daughter in Guadalajara

---

1. Matta–Ballesteros was tried with Zuno–Arce and two other alleged coconspirators, Javier Vas- quez–Velasco and Juan Jose Bernabe–Ramirez.

in September 1984, members of the enterprise—with the exception of Matta–Ballesteros—discussed these losses and suggested that the DEA agent they believed was responsible should be "picked up."

At a meeting held prior to the wedding of Barba–Hernandez' brother in Guadalajara in October 1984, members of the enterprise, including Matta–Ballesteros, met and discussed the DEA seizures as well as a police report file covering one of the major marijuana seizures at Zacatecas, Mexico. The DEA agent responsible for the seizures was again discussed. The enterprise held yet another meeting after the wedding, in which Zuno–Arce suggested that the DEA agent should be "picked up" when his identity was discovered.

By December 1984, Fonseca–Carrillo had identified the responsible DEA agent as Special Agent Enrique Camarena. Fonseca–Carrillo said that he would "take care of" Camarena. In February 1985, Zuno–Arce, Fonseca–Carrillo, Caro–Quintero and Barba–Hernandez met in Guadalajara and once again discussed picking up the DEA agent, finding out how much he knew, and learning who was cooperating with him.

Camarena disappeared on February 7, 1985 after leaving the DEA office in Guadalajara. Out-of-court statements, audiotapes and physical evidence, including hair, carpet fibers, sheet fabric and rope strands, showed that Camarena had been taken to a house at 881 Lope del Vega in Guadalajara, where he was held, tortured, interrogated and finally killed.

Matta–Ballesteros was seen checking out of a hotel in Guadalajara on February 12, 1985, apparently after learning he was under surveillance. Hairs consistent with Matta–Ballesteros's were found in the guest house and bedroom at Lope del Vega, suggesting his presence there sometime after the house had been recarpeted in January 1985.

On April 29, 1985, in Cartagena, Colombia, Matta–Ballesteros was detained by Colombian police on charges unrelated to Camarena's kidnapping and murder. The Colombian police took him to Bogata where DEA agents interviewed him. He denied participating in Camarena's murder but admitted having some knowledge of it, which he refused to share because he feared he would be killed if he did. The United States unsuccessfully sought Matta–Ballesteros's extradition on an unrelated criminal complaint filed in the Southern District of New York and failed to follow through on extradition efforts with regard to a previously dismissed, but newly revived fourteen-year-old charge for escape from federal authorities. Matta–Ballesteros returned to Honduras.

Near dawn on April 5, 1988, Matta–Ballesteros was abducted from his home in Tegucigulpa, Honduras. Aided by Honduran Special Troops, or "Cobras," four United States Marshals bound his hands, put a black hood over his head, thrust him on the floor of a car operated by a United States Marshal, and drove him to a United States Air Force Base in Honduras. The Marshals then moved him to the United States, via the Dominican Republic. Within twenty-four hours of his armed abduction Matta–Ballesteros was a prisoner in the federal penitentiary at Marion, Illinois. The government does not dispute that he was forcibly abducted from his home in Honduras.

The government does dispute his account of how he was treated by his abductors. Matta–Ballesteros claims that while being transported bound and hooded to the United States Air Force Base he was beaten and burned with a stun gun at the direction of the Marshals. He claims that during his flight he was once again beaten and tortured by a stun gun applied to various parts of his body, including his feet and genitals.

Matta–Ballesteros unsuccessfully petitioned for a writ of habeas corpus. *Matta–Ballesteros v. Henman*, 896 F.2d 255 (7th Cir.1990), *cert. denied*, 498 U.S. 878, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). Subsequently, he was convicted in the Northern District of Florida for various narcotics charges and escape. These convictions were upheld on appeal. *United States v. Matta*, 937 F.2d 567 (11th Cir.1991).

Following that conviction, Matta–Ballesteros was brought before the Central District of California to face charges that he participated in the conspiracy to kidnap and kill

Camarena. In the trial which we review, Matta–Ballesteros was charged, tried and convicted of the following: (1) committing, aiding and abetting or conspiring to commit a violent act in support of an enterprise engaged in racketeering, in violation of 18 U.S.C. § 1959; (2) conspiracy to kidnap a federal agent, in violation of 18 U.S.C. § 1201(c); and (3) participating in the kidnapping of a federal agent, in violation of 18 U.S.C. § 1201(a)(5). He was acquitted on charges of murdering a federal agent engaged in his official duties, in violation of 18 U.S.C. § 1111(a).

## II

■ Matta–Ballesteros argues that because of his abduction from Honduras and his being beaten and interrogated during his trip to the United States, the district court was precluded from exercising jurisdiction over him. Specifically, Matta–Ballesteros argues that (a) the extradition treaties between Honduras and the United States prohibit his prosecution, and (b) the shocking nature of his abduction and mistreatment requires dismissal. We review this jurisdictional challenge de novo. *United States v. Walczak*, 783 F.2d 852, 854 (9th Cir.1986).[2]

## A

■ Matta–Ballesteros argues that the extradition treaties between Honduras and the United States preclude his prosecution because of the recent Supreme Court ruling that treaties are self-executing and bestow rights upon individuals. *United States v. Alvarez–Machain*, 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). However, *Al-*

*varez–Machain* primarily holds that where the terms of an extradition treaty do not specifically prohibit the forcible abduction of foreign nationals, the treaty does not divest federal courts of jurisdiction over the foreign national. *Id.* at 664–66, 112 S.Ct. at 2193–95. *Alvarez–Machain* therefore dictates that, in the absence of express prohibitory terms, a treaty's self-executing nature is illusory.

■ The treaties between the United States and Honduras contain preservations of rights similar to those which *Alvarez–Machain* held did not sufficiently specify extradition as the only way in which one country may gain custody of a foreign national for purposes of prosecution. *Compare* 504 U.S. at 665–66, 112 S.Ct. at 2194–95 *with* 1909 Honduras–United States Extradition Treaty (37 Stat. 1616; 45 Stat. 2489), Art. VIII; 1933 Inter–Americas Extradition Treaty (49 Stat. 3111), Arts. II–IV, XXI. Nothing in the treaties between the United States and Honduras authorizes dismissal of the indictment against Matta–Ballesteros.

## B

■ The Supreme Court has long held that the manner by which a defendant is brought to trial does not affect the government's ability to try him. *Ker v. Illinois*, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886); *Frisbie v. Collins*, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952).

■ Though we may be deeply concerned by the actions of our government, it is clear in light of recent Supreme Court precedent that the circumstances surrounding Matta–

---

**2.** The government argues that Matta–Ballesteros is collaterally estopped from litigating the jurisdiction issue in this court because that issue has already been fully and fairly litigated as to him in two other federal circuits in cases where he challenged jurisdiction on the same grounds, *United States v. Matta*, 937 F.2d 567 (11th Cir. 1991) and *Matta–Ballesteros v. Henman*, 896 F.2d 255 (7th Cir.), *cert. denied*, 498 U.S. 878, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). The government cites no authority showing that the jurisdictional decisions of these circuits have preclusive effect in this case. Both *United States v. Van Cauwenberghe*, 934 F.2d 1048 (9th Cir.1991) and *United States v. Borneo, Inc.*, 971 F.2d 244 (9th Cir.1992) involve collateral attacks to final

judgments, not independent jurisdictional challenges. All of the other cases cited by the government involve similar situations where a party sought collaterally to challenge an adverse judgment on jurisdictional grounds, calling into question the doctrine of res judicata, not collateral estoppel. *Durfee v. Duke*, 375 U.S. 106, 111–12, 84 S.Ct. 242, 245–46, 11 L.Ed.2d 186 (1963); *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 2104 n. 9, 72 L.Ed.2d 492 (1982). None of these cases stand for the proposition that there is collateral estoppel effect as to the litigation of similar jurisdictional issues in unrelated cases. That is the issue before this court.

Ballesteros's abduction do not divest this court of jurisdiction in this case. Since we have already concluded that the relevant treaty does not prohibit the abduction, "the rule in *Ker* applies, and the court need not inquire as to how respondent came before it." *Alvarez–Machain,* 504 U.S. at 662, 112 S.Ct. at 2193. In the shadow cast by *Alvarez–Machain,* attempts to expand due process rights into the realm of foreign abductions, as the Second Circuit did in *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974), have been cut short.

In *Toscanino,* the defendant alleged that United States agents abducted him from Uruguay, pistol-whipped, bound, blindfolded, brutally tortured, and interrogated him for seventeen days, and finally drugged and brought him to the United States by airplane, all with the knowledge of an Assistant United States Attorney. *Id.* at 269–70. That court held that if Toscanino's allegations were true, his indictment was subject to dismissal based on the federal court's supervisory powers over the administration of criminal justice first outlined by the Supreme Court in *McNabb v. United States,* 318 U.S. 332, 340–41, 63 S.Ct. 608, 612–13, 87 L.Ed. 819 (1943). In holding that the supervisory powers of the court could require dismissal, *Toscanino* relied in part on Supreme Court decisions addressing other types of outrageous governmental conduct, including *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)[3] and *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973).[4] *Toscanino,* 500 F.2d at 274–76.

This court has held, however, that we have inherent supervisory powers to order dismissal of prosecutions for only three legitimate reasons: (1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct. *United States v. Simpson,* 927 F.2d 1088, 1090 (9th Cir.). *See also United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983); *United States v. Gatto,* 763 F.2d 1040, 1044 (9th Cir.1985). We review dismissal based on the exercise of supervisory powers for an abuse of discretion. *United States v. Restrepo,* 930 F.2d 705, 712 (9th Cir.1991).

The circumstances surrounding Matta–Ballesteros's abduction, while disturbing to us and conduct we seek in no way to condone, meet none of these criteria. It is particularly troublesome to us that the alleged acts were conducted by United States Marshals, officials who purportedly act in our best interest. Although they are members of the Executive Branch, Marshals serve a very special purpose within the judiciary, because their "primary role and mission [is] to provide for the security and to obey, execute, and enforce, all orders of the United States District Courts, the United States Courts of Appeals, and the Court of International Trade." 28 U.S.C. § 566(a). While it may seem unconscionable to some that officials serving the interests of justice themselves become agents of criminal intimidation, like the DEA agents in *Alvarez–Machain,* their purported actions have violated no recog-

---

**3.** The *Toscanino* court relied upon *Rochin* and other Supreme Court decisions since *Ker* that it believed had effectively overruled the *Ker–Frisbie* doctrine in holding that due process required dismissal. *Id.* at 275. The *Toscanino* court stated that the *Ker–Frisbie* doctrine could not "be reconciled with the Supreme Court's expansion of the concept of due process, which now protects the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part." *Id.*

Later Supreme Court cases illustrate that the *Toscanino* court was not prescient. The Supreme Court has consistently reaffirmed the *Ker–Frisbie* doctrine, most recently in *Alvarez–Ma-*

*chain.* Additionally, the Court has held that a defendant's body is not a suppressible fruit, and the illegality of a defendant's detention cannot deprive the government of the opportunity to prove his guilt. *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975); *United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980). Thus, the court should only consider dismissing the indictment based upon its supervisory powers.

**4.** *Russell* cited *Rochin* as support for the proposition that "due process principles [could] absolutely bar the government from invoking judicial processes to obtain a conviction...." *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1643.

nized constitutional or statutory rights. They ·have likewise engaged in no illegal conduct which this court could attempt to deter in the future by invoking its supervisory powers.[5]

The *only* way we could exercise our supervisory powers in this particular case is if the defendant could demonstrate governmental misconduct "of the most shocking and outrageous kind," so as to warrant dismissal. *United States v. Valot,* 625 F.2d 308, 310 (9th Cir.1980). *See also United States v. Fielding,* 645 F.2d 719, 723 (9th Cir.1981) and *Leiterman v. Rushen,* 704 F.2d 442, 443 (9th Cir.1983). Matta–Ballesteros has not. His alleged treatment, even if taken as true, does not meet this rigorous standard, and the acts alleged were not nearly as egregious as those committed in *Toscanino.*

The district court conducted a limited evidentiary hearing, concluding that Matta–Ballesteros failed to make " 'a strong showing of grossly cruel and unusual barbarities inflicted upon him by persons who can be characterized as paid agents of the United States.' *United States v. Lovato,* 520 F.2d 1270, 1271 (9th Cir.) (per curiam), *cert. denied,* 423 U.S. 985 [96 S.Ct. 392, 46 L.Ed.2d 302] (1975). Defendant's allegations of mistreatment, even if taken as true, do not constitute such barbarism as to warrant dismissal of the indictment under the caselaw." [Excerpts of Record 60] The district court's findings are reviewed for clear error. *Fielding,* 645 F.2d at 724.

During the evidentiary hearing, the court heard testimony from Matta–Ballesteros about the purported torture, and he submitted pictures taken upon his arrival at the federal prison as well as a report on stun guns and the declarations of several eyewitnesses who declared he was shocked with the stun ·guns. The court also considered testimony or declarations from a psychologist and two physicians who examined Matta–Ballesteros, Dr. Donald Valles and Dr. John Van der Decker, who indicated that the cause of his injuries was inconclusive. Additionally, the court considered the declarations and testimony of Juan Morales and Roberto Escobar, United States Marshals who were present at Matta–Ballesteros's capture in Honduras, and who transported him from the Dominican Republic to Marion. They contradicted his testimony, and alleged that he was not tortured and that no stun gun was used on him. .

While we may have a suspicion of Matta–Ballesteros's inhumane treatment, and the evidence reasonably could support a finding that he was tortured, it could also support the conclusion of the district court. Because the district court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it even though we may be convinced that, sitting as the trier of fact, we would have weighed the evidence differently. *Employees Int'l Union v. Fair Political Practices,* 955 F.2d 1312, 1317 n. 7 (9th Cir.) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985)), *cert. denied,* 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992). We are therefore bound by the district court's findings, and hold that its determination regarding the alleged torture was not clearly erroneous.

Thus, much as we may want to dismiss this case through an exercise of our supervisory

---

**5.** Matta–Ballesteros's abduction, even if we labelled it a "kidnapping," does not violate recognized constitutional or statutory provisions in light of *Alvarez–Machain.* Kidnapping also does not qualify as a *jus cogens* norm, such that its commission would be justiciable in our courts even absent a domestic law. *Jus cogens* norms, which are nonderogable and peremptory, enjoy the highest status within customary international law, are binding on all nations, and can not be preempted by treaty. *Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 939–40 (D.C.Cir.1988). While Art. 9 of the Universal Declaration of Human Rights does state that no one "shall be subjected to arbitrary arrest, detention or exile," G.A.Res. 217A(III), 3(1), U.N.GAOR Resolutions 71, U.N.Doc. A1810 (1940), kidnapping does not rise to the level of other *jus cogens* norms, such as torture, murder, genocide, and slavery. *See Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 717 (9th Cir.1992), *cert. denied,* 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993) ("[W]e conclude that the right to be free from official torture is ·fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens.*").

powers, to do so would be unwarranted. The district court did not abuse its discretion in refusing to exercise such powers.[6] In retaining jurisdiction of this case, we now turn to the specifics of Matta–Ballesteros's appeals.

## III

█ Matta–Ballesteros argues that the evidence against him was insufficient to support his conviction. In considering a challenge to the sufficiency of the evidence, we decide, after viewing the evidence in the light most favorable to the government, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Aichele*, 941 F.2d 761 (9th Cir.1991).

█ The essential elements of a conspiracy are (1) an agreement to accomplish an illegal objective, (2) the commission of an overt act in furtherance of the conspiracy, and (3) the requisite intent necessary to commit the underlying offense. *United States v. Thomas*, 887 F.2d 1341, 1347 (9th Cir.1989). An agreement may be inferred from the defendant's acts pursuant to the scheme, or other circumstantial evidence, and a defendant's proximity to the scene of illicit activity may support an inference when viewed in context with other evidence. *Id.* at 1347–48. Once the existence of a conspiracy is shown, the government need only prove a slight connection between the defendant and the conspiracy. *Aichele*, 941 F.2d at 763–64. A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the codefendants' actions. Acts which seem oth-

erwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity. *Id.; see also United States v. Sanchez–Mata*, 925 F.2d 1166, 1168 (9th Cir.1991).

█ The evidence showed that Matta–Ballesteros was a member of the Guadalajara cartel and that he participated in some of the meetings with other members of the cartel where Camarena's kidnapping was planned.[7] The evidence also showed members of the cartel abducted, tortured and murdered Camarena. The testimony of Hector Cervantes–Santos, which the jury believed and which is not inherently incredible, tied Matta–Ballesteros specifically to the crime. Thus, the evidence was sufficient to show that Matta–Ballesteros was involved in a conspiracy targeted at Camarena. Furthermore, because a conspirator is liable for all foreseeable substantive offenses committed in furtherance of the conspiracy, *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946), there was also sufficient evidence to support his conviction on the substantive charges.[8]

## IV

█ Matta–Ballesteros argues that the district court erred in not granting him a new trial because the jurors knew about his prior convictions during the deliberations on his charges. Where extraneous materials are presented to the jury, the defendant will receive a new trial if we find a reasonable possibility that the material could have affected the verdict. *United States v. Maree*,

---

**6.** As the government suggests, the availability of civil damages may be a sufficient remedy for the misconduct alleged by Matta–Ballesteros. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971).

**7.** Matta–Ballesteros cites *United States v. DePew*, 932 F.2d 324 (4th Cir.), *cert. denied*, 502 U.S. 873, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991), as support for his contention that he had no intent to kidnap a specific DEA agent, Camarena, even if the evidence against him is viewed in the light most favorable to the government. However, *DePew* does not support his argument. The *DePew* court held that there was sufficient evidence of a conspiracy to kidnap because although "ev-

ery detail of their plan had not been agreed upon, the essential nature of the plan was in place...." *Id.* at 326. Indeed, the evidence of intent to kidnap a specific person was absent in *DePew*, where the conspiracy was to kidnap a young boy of approximately 12 years of age. *Id.* In this case, the evidence shows that, whether or not his name was known at all times, Camarena was the target of the conspiracy.

**8.** Additionally, the jury could have properly convicted him as an aider and abettor in the commission of a violent act under 18 U.S.C. § 1959 and as a participant in the kidnapping or confinement of Camarena under 18 U.S.C. § 1201(a)(5).

934 F.2d 196, 201 (9th Cir.1991) (citing *United States v. Madrid*, 842 F.2d 1090, 1093–94 (9th Cir.), *cert. denied*, 488 U.S. 912, 109 S.Ct. 269, 102 L.Ed.2d 256, 257 (1988)). We review the district court's findings as to historical facts relating to the issue of jury misconduct for clear error. *United States v. Shirley*, 884 F.2d 1130, 1132 (9th Cir.1989).

■■■ The district court denied Matta–Ballesteros's motion. *See United States v. Caro–Quintero*, 769 F.Supp. 1564 (C.D.Cal. 1991). The court held that the single juror who testified that the jury had access to extraneous information during its deliberation on the charges against Matta–Ballesteros was not credible, based on the contradiction between his testimony during the *in camera* examination,[9] his declaration, and his testimony at the evidentiary hearing. We review the trial court's ruling on the credibility of a witness for clear error. *United States v. Clawson*, 831 F.2d 909, 914 (9th Cir.1987), *cert. denied*, 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 323 (1988). Furthermore, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1984).

■■■ This case is no exception. The single juror's testimony contradicted the testimony of other jurors as well as his own prior testimony. The juror's testimony also was vague as to exactly when he learned of Matta–Ballesteros's prior convictions and the substance of what he learned about them before a verdict was reached. This testimony provides no basis for finding that the jury received extraneous information. Therefore, the district court's finding that the jury did not have access to extraneous information is not clearly erroneous.

## V

■■■ Matta–Ballesteros argues that the district court erred in (1) denying his motion to exclude hair comparison evidence as untimely, and (2) admitting expert testimony regarding hair comparison. We review both of these rulings for an abuse of discretion. *United States v. Vasquez*, 858 F.2d 1387, 1389 (9th Cir.1988), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 847, 102 L.Ed.2d 978 (1989); *United States v. Christophe*, 833 F.2d 1296 (9th Cir.1987).

■■■ The motion cut-off date in this case was set by the district court pursuant to Fed.R.Crim.P. 12(c) at March 7, 1990. Matta–Ballesteros argues that his motion to exclude the hair comparison evidence, filed May 15, 1990, was filed as soon as possible. The record does not support this contention. The primary reason that Matta–Ballesteros gives for filing late, the government's intransigence in providing the hair samples, is not a reason for filing the motion late but is rather a reason for filing the motion earlier on different grounds. The district court did not abuse its discretion in denying the untimely motion pursuant to Fed.R.Crim.P. 12(f).

■■■ Furthermore, Fed.R.Evid. 702 did not warrant the exclusion of the expert testimony. Matta–Ballesteros's objection went to the weight, not the admissibility, of the testimony. *United States v. Oaxaca*, 569 F.2d 518, 526 (9th Cir.), *cert. denied*, 439 U.S. 926,

**9.** Matta–Ballesteros further argues that the district court's findings regarding the jury's access to extraneous information are erroneous because the court initially examined the jurors without all counsel present and refused to allow counsel to examine the jurors. The district court has broad discretion to determine the type of investigation which must be mounted, and a full-blown evidentiary hearing is not required. The district court's primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and, if so, whether it was prejudicial. *United States v. Boylan*, 898 F.2d 230, 258 (1st Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); *see also United States v. Langford*, 802 F.2d 1176, 1180 (9th Cir.1986), *cert. denied*, 483 U.S. 1008, 107 S.Ct. 3235, 97 L.Ed.2d 740 (1987) (stating that "not every allegation that extraneous information has reached the jury requires a full-dress hearing.") The district court gave counsel transcripts from the *in camera* hearing and allowed them to submit proposed questions to the court. This procedure was sufficient. The record reflects that the district court sufficiently developed the facts surrounding this issue.

99 S.Ct. 310, 58 L.Ed.2d 319 (1978). The jury was able to consider the fact that microscopic hair comparison could not determine that the hairs found at Lope del Vega belonged to Matta–Ballesteros. This was acknowledged both on direct and on cross-examination, and Matta–Ballesteros's own expert testified on this issue. The jury was further able to evaluate the prosecution expert's conclusion in light of all the evidence and give it the appropriate weight. Therefore, the district court did not abuse its discretion in allowing the expert testimony.

## VI

Matta–Ballesteros challenges the district court's exclusion of the evidence that he argues requires reversal of his conviction.

### A

 Matta–Ballesteros argues that the district court erred in excluding as inadmissible hearsay a report prepared by a psychologist who met with Matta–Ballesteros at the Marion prison, and a presentence report prepared by a probation officer. Matta–Ballesteros argues that these documents support his contention that he is illiterate and therefore could not have been seen reading the police reports of the Zacatecas drug seizure as the government's main witness, Hector Cervantes–Santos, Barba–Hernandez' former employee, testified. We review the district court's exclusion of evidence under the hearsay rule for an abuse of discretion. *United States v. George,* 960 F.2d 97, 99–100 (9th Cir.1992).

The district court excluded the psychologist's report because it determined that Matta–Ballesteros's statement regarding his illiteracy was not made for purposes of medical diagnosis or treatment. The court's ruling refers to Fed.R.Evid. 803(4), which provides an exception to the hearsay rule for "[s]tatements made for the purpose of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception of general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

 The statement in the psychologist's report had nothing to do with Matta–Ballesteros's diagnosis or treatment. Indeed, Matta–Ballesteros was ordered to see the prison psychologist and did not even believe that he had any reason to see the psychologist. Matta–Ballesteros thus had no special incentive to be truthful. *See* 4 J. Weinstein & M. Berger, *Weinstein's Evidence,* § 803(4)[02] (1992). Therefore, the district court did not abuse its discretion in excluding the psychologist's report under Rule 803(4).

 The hearsay statement in the presentence report is not admissible to show that Matta–Ballesteros may be illiterate. "No firmly rooted exception to the hearsay rule can possibly apply to the Presentence Report." *United States v. Fortier,* 911 F.2d 100, 104 (8th Cir.1990), *overruled on different grounds, United States v. Wise,* 976 F.2d 393 (8th Cir.1992), *cert. denied,* 507 U.S. 989, 113 S.Ct. 1592, 123 L.Ed.2d 157 (1993). The presentence report is not admissible at trial to prove any of the hearsay contained therein.

### B

Matta–Ballesteros argues that the district court abused its discretion in excluding authenticated records from the four Guadalajara municipalities regarding the nonexistence of both the marriage of Jorge Barba–Hernandez and the birth of Yuremi Barba–Hernandez, and in excluding Jorge Barba–Hernandez' Guadalajara death certificate. Matta–Ballesteros argues that these records prove facts inconsistent with Cervantes–Santos's testimony that Matta–Ballesteros had attended meetings on the occasion of Jorge Barba–Hernandez' wedding and Yuremi Barba–Hernandez' birth.

 However, Matta–Ballesteros cannot establish the absence of public records under Fed.R.Evid. 803(10) because he failed to show as a preliminary matter under Fed.R.Evid. 104(b) that the events necessarily occurred in one of the four Guadalajara municipalities. There are 2,800 other municipalities in Mexico where the marriage and birth could have occurred. Furthermore, if only a religious marriage occurs or if parents do not

register a child after birth, there may be no records at all. Finally, there was no legal requirement for prior marriages to be . recorded on a death certificate, even if both were registered within the same municipality. "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." *Id.; see also United States v. Regner,* 677 F.2d 754, 758 n. 3 (9th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 220, 74 L.Ed.2d 175 (1982) (affirming the admission of a government record under 803(10) based on evidence that foreign government-owned taxicab company owned all taxicabs and was legally required to record all accidents involving taxicabs). Therefore, the district court did not abuse its discretion in determining that the conditional relevance requirements had not been met and in excluding the records from these four municipalities.

## VII

■ Matta–Ballesteros argues that the district court erred in admitting audiotape recordings of Camarena's torture and interrogation at Lope del Vega because (1) there was an inadequate showing of authenticity and chain of custody, and (2) the tapes and transcripts were unduly prejudicial under Fed.R.Evid. 403. We review the district court's ruling for an abuse of discretion. *United States v. Black,* 767 F.2d 1334, 1342 (9th Cir.), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985); *United States v. Layton,* 855 F.2d 1388, 1402 (9th Cir.1988), *cert. denied,* 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

Matta–Ballesteros incorrectly asserts that the district court failed to comply with the requirements for admitting tape recordings into evidence set forth in *United States v. McMillan,* 508 F.2d 101, 104 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975).[10] The Eighth Circuit

has said that "when the facts demonstrate that the recording was found in a defendant's possession, it should not be subject to the same requirements we apply when a government agent or informant initiates a conversation knowing it is to be recorded.... [U]nder such circumstances mechanical or wooden application of the *McMillan* requirements is [not] necessary." *United States v. O'Connell,* 841 F.2d 1408, 1420 (8th Cir.1988), *cert. denied,* 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989).

■ The audiotapes were obtained from one of Matta–Ballesteros's codefendants. Under such circumstances, we have held that tapes are sufficiently authenticated under Fed.R.Evid. 901(a) if "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Black,* 767 F.2d at 1342, (citing 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 901(a)[01], at 901–16 to 17 (1983)). This is done by proving a connection between the evidence and the party against whom the evidence is admitted, and can be done by both direct and circumstantial evidence. *Id.* The district court did not abuse its discretion in admitting the tapes because the government presented evidence to show that it had not tampered with the tapes and that the speakers were parties involved in this case. We have found similar showings to be sufficient in other cases. *See O'Connell,* 841 F.2d at 1420–21; *United States v. Kandiel,* 865 F.2d 967, 974 (8th Cir.1989).

■ The district court also did not abuse its discretion despite the defects in chain of custody. The prosecution must introduce sufficient proof so that a reasonable juror could find that tapes are in substantially the same condition as when they were seized, and may admit the tapes if there is a reasonable probability the tapes have not been changed in important respects. *United States v. Harrington,* 923 F.2d 1371 (9th Cir.), *cert. denied,* 502 U.S. 854, 112 S.Ct.

---

10. *McMillan* requires the proponent of such evidence to show (1) the recording device was capable of taping the conversation; (2) the operator was competent to operate the device; (3) the recording was authentic and correct; (4) no changes, additions or deletions have been made in the recording; (5) the recording is shown to have been preserved; (6) the speakers are identified; and (7) the elicited conversation was made without inducement. *Id.*

164, 116 L.Ed.2d 128 (1991) (citing *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir. 1960)). Furthermore, a defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced. *United States v. Robinson,* 967 F.2d 287, 292 (9th Cir.1992) (citing *United States v. Candoli,* 870 F.2d 496, 509 (9th Cir.1989)). The evidence presented by the prosecution is sufficient to meet this burden, and there is arguably no defect in the chain of custody since there is evidence tracing the tapes from Matta–Ballesteros's codefendant's possession to trial.

■ The probative value of the tapes was not outweighed by their prejudicial nature. The tapes were submitted as evidence not only to show what was said but also to rebut the defendants' assertion that Camarena's injuries could have occurred after his death, and to show the intent and motive of Camarena's kidnappers. These legitimate purposes, along with the district court's limiting instruction, show that the court did not abuse its discretion in determining that the tapes were not unduly prejudicial despite their gruesome content. We give "wide latitude to the trial judge in determining the admissibility of evidence because he is in the best position to assess the impact and effect of evidence based upon what he perceives from the live proceedings of the trial, while we can review only a cold record." *United States v. Ford,* 632 F.2d 1354, 1377 (9th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981). The district court properly admitted the tapes.

### VIII

■ Matta–Ballesteros argues that the district court erred in evaluating the effect of pretrial identification procedures and in determining that Cervantes–Santos's in-court identification was not impermissibly tainted. We review the constitutionality of pretrial identification procedures de novo. *United States v. Love,* 746 F.2d 477, 478 (9th Cir.1984); *see also United States v. Nash,* 946 F.2d 679, 681 (9th Cir.1991). To determine whether an identification procedure is so impermissibly tainted as to give rise to a substantial likelihood of mistaken identifica-

tion and thereby a violation of due process, we review the totality of the circumstances. *See Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

■ Cervantes–Santos had an opportunity to observe Matta–Ballesteros at the two meetings and over approximately a one day period in October 1984. In January 1990, Cervantes–Santos was shown a collection of 97 photographs of various suspects, including Matta–Ballesteros. Prior to testifying, Cervantes–Santos was shown photographs of Matta–Ballesteros and other Camarena defendants. However, Cervantes–Santos was never told that any person in any photograph was Matta–Ballesteros.

The pretrial procedure was not impermissibly suggestive, and therefore did not violate due process. *See United States v. Bagley,* 772 F.2d 482 (9th Cir.1985), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986). There is no record in this case that Cervantes–Santos was told or led to believe that any person in any of the pictures that he was shown prior to his in-court identification was Matta–Ballesteros. While Matta–Ballesteros's picture was not shown among a more conventional photo array, where similar looking individuals or people who are not suspects are also shown, there is no basis for concluding that the procedure here was impermissibly suggestive.

■ In any event, the totality of the circumstances suggests that the in-court identification was reliable. *Id.* The circumstances to be considered are (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972). Cervantes–Santos had a great deal more time to view Matta–Ballesteros than many witnesses have to view a defendant, and spent much of that time in the same room with him. Cervantes–Santos was also able to

describe Matta–Ballesteros's appearance in 1984 in detail during his testimony. Finally, Cervantes–Santos correctly identified Matta–Ballesteros in court. The intervening six years between Cervantes–Santos's observation and in-court identification do not make the latter unreliable.

## IX

■ Matta–Ballesteros argues that the district court erred in quashing his subpoena requesting discovery on the United States government's alleged authorization of the racketeering enterprise alleged in the indictment pursuant to Fed.R.Crim.P. 16(a). Matta–Ballesteros also argues that, as a result, the district court erred in excluding relevant evidence. We review these rulings for an abuse of discretion. *United States v. Polizzi*, 801 F.2d 1543, 1551 (9th Cir.1986); *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir.), *cert. denied*, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). Underlying factual determinations are reviewed for clear error. *United States v. Laurins*, 857 F.2d 529, 541 (9th Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989).

Matta–Ballesteros and other defendants attempted to assert a defense of public authority. *See* Fed.R.Crim.P. 12.3. The defendants primarily relied on a news article concerning an alleged connection between Felix–Gallardo, the CIA, and the Nicaraguan Contras with respect to arms smuggling.[11] The defendants also relied on testimony from a government witness, Lawrence Harrison. Ultimately, however, Harrison testified that he had no personal knowledge of CIA involvement with drug traffickers in Mexico.

■ The court's determination that there was no evidence of a connection between the defendants' activities and the government, and that the subpoena was not likely to lead to the discovery of relevant evidence, was not clearly erroneous. There

was no showing that any relationship between Felix–Gallardo, the CIA, and the Nicaraguan Contras amounted to United States government approval of the narcotics enterprise alleged in the indictment. Indeed, the evidence at trial concerning the DEA's aggressive enforcement of the United States' laws against narcotics trafficking showed exactly the opposite.[12] A defendant is not entitled to government documents relating to alleged CIA involvement in his criminal activity where no sufficient showing of potential relevance has been made under Fed. R.Crim.P. 16. *See United States v. Little*, 753 F.2d 1420, 1444–45 (9th Cir.1984). Therefore, the district court did not abuse its discretion in quashing the subpoena and, consequently, in excluding evidence of CIA authorization.

## X

■ Matta–Ballesteros argues that the district court erred in denying his motion for severance and that joinder in this case was improper and prejudicial under Fed. R.Crim.P. 8(a), 8(b), and 14. Generally, defendants jointly charged are jointly tried. *United States v. Hernandez*, 952 F.2d 1110, 1114 (9th Cir.1991), *cert. denied*, 506 U.S. 920, 113 S.Ct. 334, 121 L.Ed.2d 252 (1992). We review the district court's denial of severance for an abuse of discretion, and a defendant seeking reversal has the burden of proving clear, manifest or undue prejudice from a joint trial. *United States v. Joetzki*, 952 F.2d 1090, 1094 (9th Cir.1991). The evidence of prejudice must demonstrate that Matta–Ballesteros was denied a fair trial. *Id.*

The gist of Matta–Ballesteros's argument is that he was joined and tried along with counts charging only his codefendants, whom he contends were engaged in an altogether different racketeering enterprise based on

---

11. Jeff Gerth, *CIA Shedding Its Reluctance to Aid in Fight Against Drugs*, N.Y. Times, March 25, 1990 at A1, A22.

12. Furthermore, this defense would probably fail as a matter of law. "[T]he CIA is prohibited from violating the statutes of the United States

and hence, a CIA agent could not lawfully authorize the violation of the federal drug laws." *United States v. Rosenthal*, 793 F.2d 1214, 1235 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

different acts or transactions.[13] Matta–Ballesteros further argues that the introduction of evidence involving three homicides [14] and a marijuana enterprise with which he was not involved prejudiced him.

■ These arguments are without merit. The codefendants' charges bore a relationship to one another. Because all of the defendants, including Matta–Ballesteros, were charged with conspiring to commit and committing violent acts in furtherance of drug enterprises having similar memberships and objectives, Matta–Ballesteros was not prejudiced by joinder. "[T]he term 'transactions' has a flexible meaning" and there can be a "logical relationship between the transactions greater than the mere factual similarity of events." *United States v. Felix–Gutierrez,* 940 F.2d 1200, 1208 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993) (citing *Ford,* 632 F.2d at 1371–72). Additionally, the fact that more evidence was introduced against his codefendants is insufficient to show that joinder was improper. *Polizzi,* 801 F.2d at 1554.

■ Furthermore, there was no prejudice from the joinder because the jury was able to compartmentalize the evidence on the various counts against each defendant. *See Felix–Gutierrez,* 940 F.2d at 1210. The district court instructed the jury several times during trial that evidence was not admitted against one or more codefendants, and gave a general limiting instruction to the jury before deliberations. These instructions militate against Matta–Ballesteros's prejudice claim. "Judicial economy justifies reliance on the jury to follow the instructions of the court that segregate the evidence and limit the applicability of the evidence to each defendant." *United States v. Vaccaro,* 816 F.2d 443, 448 (9th Cir.), *cert. denied,* 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987). The district court did not abuse its discretion

in trying Matta–Ballesteros as he was charged.

## XI

■ Matta–Ballesteros argues that the district court erred in instructing the jury regarding his liability under 18 U.S.C. § 1959. Matta–Ballesteros contends that the district court's instruction that he could be found guilty of violating section 1959 if he "participated in the commission of a violent act as charged ... or aided and abetted in the commission of the violent acts as charged or ... conspired in the commission of the violent acts as charged" added an uncharged crime to the indictment. Matta–Ballesteros further contends that, due to this instruction, there is no way of determining whether he was convicted based on a unanimous verdict. An assertion that the trial court's jury instructions misstated the elements of a crime is a question of law that we review de novo. *United States v. Streit,* 962 F.2d 894, 898 (9th Cir.), *cert. denied,* 506 U.S. 962, 113 S.Ct. 431, 121 L.Ed.2d 352 (1992). We determine whether, viewing the instructions as a whole, the court gave adequate instruction, and whether the instruction was misleading or stated the law incorrectly to the prejudice of the objecting party. *United States v. Terry,* 911 F.2d 272, 279 (9th Cir.1990) (citations omitted).

■ There is no merit to Matta–Ballesteros's argument. Count Four of the indictment charged that Matta–Ballesteros "did aid, abet, counsel, induce, procure, cause and otherwise willfully participate" in a violation of 18 U.S.C. § 1959. The district court dismissed Count Three of the indictment, which charged Matta–Ballesteros in a conspiracy to violate section 1959, because it determined that this count was duplicitous of Count Four. In dismissing Count Three, the district court held, and Matta–Ballesteros

---

**13.** Counts Nine and Ten charged Bernabe–Ramirez (and others not on trial) with hindering a federal prosecution in violation of 18 U.S.C. § 3 for aiding in Caro–Quintero's escape from federal prison.

**14.** Counts One and Two charged Vasquez–Velasco (and others not on trial) with violence in aid of racketeering in violation of 18 U.S.C. § 1959

for the murders of American citizens John Walker and Alberto Redelat, who apparently were mistaken for DEA agents. Count Five charged Bernabe–Ramirez (and others not on trial) with violence in aid of racketeering in violation of 18 U.S.C. § 1959 for the murder of DEA helicopter pilot Alfredo Zavala–Avelar.

agreed, that Count Four contained a conspiracy charge; no additional crime was added to the indictment in the jury instructions. Furthermore, the court instructed the jury that "unanimous agreement among the jurors that the defendant engaged in at least one of the types of conduct" was required. This is sufficient to ensure a unanimous verdict. *See United States v. Castro*, 887 F.2d 988, 991 (9th Cir.1989); *United States v. Frazin*, 780 F.2d 1461, 1468 (9th Cir.), *cert. denied*, 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986). There was no error in the district court's instruction.

Matta–Ballesteros also argues that, due to the instruction, there is no way of determining whether he was properly sentenced. This issue is of no moment. Matta–Ballesteros's contention that he would be subject to a lesser sentence if the jury convicted him of conspiracy under 18 U.S.C. § 371 ignores the holding in *Pinkerton*, 328 U.S. at 646–47, 66 S.Ct. at 1183–84, which makes conspirators liable for every substantive offense committed in furtherance of the conspiracy. Furthermore, Matta–Ballesteros was subject to the same sentence under section 1959, either as a primary participant, aider and abettor, or conspirator. 18 U.S.C. § 1959(a)(1).

None of the alleged errors committed by the district court afford Matta–Ballesteros any relief. The judgment of the district court is therefore **AFFIRMED.**

NOONAN, Circuit Judge, concurring:

This case has been pending in this court for nearly two years. The long delay in decision does not reflect inattention or negligence but the great uncertainty the court has experienced in dealing with the situation where our jurisdiction was brought about by the kidnapping of the defendant from Honduras, a kidnapping performed by United States Marshals.

*What This Case Is Not.* This case does not involve the kidnapping by a private citizen of a defendant residing in a foreign country and wanted for an offense against the statute of a particular state of the United States and the subsequent placing of the kidnapped person on trial in the state's court.

*Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).

This case does not involve the kidnapping of a defendant from one state of the United States by police officers of another one of the states, and his removal for trial to the officers' state. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

This case does not involve the removal of the head of state of a foreign country by the military forces of the United States, acting at the direction of the President as Commander–in–Chief in an action found to be "military war," and the subsequent federal trial of the person removed. *United States v. Noriega*, 746 F.Supp. 1506, 1537 (S.D.Fla.1990).

This case does not turn on the alleged violation of a treaty between the United States and the foreign country from which the defendant was removed to undergo trial in a federal court. *United States v. Alvarez–Machain*, 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992).

This case does not turn on an alleged violation of international customary law. *United States v. Alvarez–Machain*, 971 F.2d 310 (9th Cir.1992).

This case does not turn on a protest by the sovereign of the country from which the defendant was abducted for trial in federal court; for there was no such protest. *Matta–Ballesteros v. Henman*, 896 F.2d 255, 259–260 (7th Cir.1990).

This case does not turn on the Fourth Amendment rights of the abducted defendant. *Id.* at 262.

This case does not turn on the due process rights of the abducted defendant as in *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974), a case qualified by *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975).

This case is not to be decided by stray dicta from the above cases; for what a court does not have before it a court does not authoritatively address. Emanations and intimations of the views of the opinion writer no doubt can be gathered from the dicta. They are not the holding of the court. They

do not operate as binding decisional precedent.

*What The Case Is About.* This case begins with the kidnapping at dawn, April 5, 1988, of Matta from his home in Tegucigulpa, Honduras. According to the affidavit of Juan J. Donato Morales, a United States Marshal, he and three other members of the United States Marshals Service were near Matta's residence. At about 6:00 a.m., six or seven Honduran officers grabbed Matta, wrestled him to the ground, and brought him to the car driven by Marshal Morales. The Honduran officers handcuffed Matta, put a hood over his head, and thrust him on the floor of the rear part of the car. Matta at this point was still struggling to escape. In the back seat were one Honduran officer and one United States Marshal; in front were another Honduran officer and Marshal Morales. Morales drove the car to an air base in Honduras. From there Matta was transported by air to the Dominican Republic. According to the testimony of United States Marshal Roberto Escobar, he was alerted by the Marshals' Service that Matta had been apprehended. He proceeded to the airport in the Dominican Republic with three other members of the Marshals' Service, met the plane from Honduras, took Matta into custody, and thereafter flew with him to United States territory. Within twenty-four hours of his armed abduction Matta was in the federal penitentiary at Marion, Illinois. *Matta–Ballesteros v. Henman,* 896 F.2d 255, 256 (7th Cir.1990).

That this act of kidnapping occurred is not disputed by the government. There is dispute as to how Matta was treated by his kidnappers and that treatment is not considered further here. Kidnapping in itself is a violent attack upon a human person—a sudden invasion of personal security, a brutal deprivation of personal liberty. Kidnapping in itself is a cruel act, and the cruelty is magnified when the victim's home is the place where the violent assault upon his liberty is made. Kidnapping committed in a foreign country becomes an offense against federal law when the victim is transported by the kidnappers into the United States. *United States v. Garcia,* 854 F.2d 340 (9th Cir.1988). The kidnapping continues as long as the victim is not released by the abductors. *Id.* at 343.

At the birth of our republic we submitted to the "opinions of mankind" and "a candid world" our reasons why Great Britain had become destructive of the ends for which government was necessary. Among our list of complaints was that Americans were "taken Captive on the high seas" and forcibly conscripted, and that others were transported "beyond Seas to be tried for pretended offenses." *Declaration of Independence* in 1 *The Founder's Constitution* (eds. Philip B. Kurland & Ralph Lerner) at 9–10.

If confirmation were wanted of the common view that humankind has of kidnapping it is furnished by Article 9 of the Universal Declaration of Human Rights which affirms that no one "shall be subjected to arbitrary arrest, detention or exile." G.A.Res. 217A(III), 3(1), U.N. GAOR Resolutions at 71, U.N.Doc. A/810 (1948). United Nations Security Council Resolution 579 (1985) lumps "acts of abduction" with "acts of hostage-taking" as "manifestations of international terrorism" and *"[c]ondemns unequivocally* all acts of hostage-taking and abduction." S.C.Res. 579 (1985), U.N. SCOR, 40th Year, Resolutions and Decisions at 24, U.N.Doc. S/INF/41 (1986).

The motive of the kidnappers—here no doubt well-meaning in their officiousness—does not qualify the violence of their conduct nor its impact on the person whom they kidnap. That the abductors were law enforcement officers of the United States, rather than some fanatic band, doubles the horror of their activity. If agents of the mightiest power on earth are unrestrained from kidnapping by legal authority—or rather, in obedience to higher authority in the Executive Department, see themselves constrained to kidnap—the freedom of individuals throughout the world is at the mercy of a decision made by an official of the United States Department of Justice.

It is true that Israel abducted Adolf Eichmann to stand trial in Israel. Even that case with its extraordinary features met with the condemnation of the Security Council of the United Nations. S.C.Res. 138 (1960), 15

U.N. SCOR, 15th Year, Resolutions and Decisions at 4, U.N.Doc. S/4349 (1960). Earlier precedent for governmental kidnapping is ugly. In the 1930s the Gestapo engaged in kidnapping in Switzerland. See "Kidnapping of Fugitives from Justice On Foreign Territory," 29 *Am.J.Int'l L.*, 502 (1935). Neither Nazi precedent nor Israeli exception suggests that the common view of humanity is wrong in its abhorrence of armed abduction to a foreign land. *See* Betsy Baker and Volker Röben, "To Abduct Or To Extradite. Does A Treaty Beg The Question?" 53 *Zeitschrift für ausländisches öffentliches Recht and Völkerrecht* 657, 678–79 (1993).

We are then confronted with a kidnapping, and we as judges are asked to be part of the kidnapping. We are asked to participate in two ways. First, the acts of the United States Marshals were directed to bringing Matta within the jurisdiction of the courts of the United States so that he might be tried for federal crimes and in particular for the crime of which he stands convicted in the Central District of California. The acts of the Marshals were not personal acts of revenge. Their purpose was to assure Matta's presence in the federal courts. Without the participation of the federal courts the kidnapping was purposeless. The federal courts are inextricably tied to the kidnapping because federal trial was the reason for abducting him.

If federal agents had boarded a foreign ship on the high seas and in an act of piracy removed Matta from the ship to bring him to federal trial in Los Angeles, we would not have wanted a federal judge to be a party to the piracy by conducting the trial. No more do we want federal judges to be parties to kidnapping, to be cooperators and collaborators in the cruel violence by standing ready to receive the kidnappers as they turn over their prey to their intended recipients. In the Noriega case, where the military character of Noriega's removal made judicial review impracticable, Judge Hoeveler wisely observed that otherwise the court would not be "helpless in the face of inhumane conduct shocking to the conscience." *United States v. Noriega,* 746 F.Supp. 1506, 1536 (S.D.Fla. 1990). He invoked the famous words of Justice Brandeis, which, uttered in dissent, have had a power that few majority opinions have achieved. They still speak eloquently here:

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (dissent), *overruled by Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

This court has inherent supervisory powers to dismiss prosecutions in order to deter illegal conduct. *See United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). The "illegality" deterred by exercise of our supervisory power need not be related to a constitutional or statutory violation.

[T]he scope of our reviewing power over convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity. Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as "due process of law" and below which we reach what is really trial by force.

*McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). In

*McNabb* the Supreme Court, without reaching the constitutional issues, excluded from evidence confessions obtained from suspects after lengthy, uncounseled interrogation prior to being brought before a magistrate. In this pre-*Miranda* case, Justice Frankfurter noted that "[t]he principles governing the admissibility of evidence in federal criminal trials have not been restricted ... to those derived solely from the Constitution." *Id.* at 341, 63 S.Ct. at 613. *McNabb*'s pre-*Miranda* posture provides helpful guidance to this post-*Alvarez–Machain* case because it teaches us that even where the Constitution does not explicitly prohibit certain reprehensible acts, federal courts exercising their supervisory powers must establish and maintain civilized standards.

The cases on which the majority relies do not address the exercise of our supervisory powers. *United States v. Valot,* 625 F.2d 308 (9th Cir.1980) dealt with an alleged abduction by DEA agents and spoke in the due process terms of *Toscanino. Id.* at 308–309. In *United States v. Fielding,* 645 F.2d 719 (9th Cir.1981) there was "no showing whatsoever that the United States participated in any of that conduct [the alleged torture and kidnapping in Peru]." *Id.* at 724. *Leiterman v. Rushen,* 704 F.2d 442 (9th Cir.1983) is even further off the mark, applying *Toscanino* due process criteria to the conduct of local police officers. *Toscanino* itself did not involve the conduct of United States Marshals, but a member of the police in Montevideo, Uruguay, allegedly paid by the United States. *United States v. Toscanino,* 500 F.2d at 269. No precedent stands in the way of our use of our supervisory powers here.

We must, of course, exercise these powers over our business, not someone else's. *United States v. Simpson,* 927 F.2d 1088, 1091 (9th Cir.1991). We must exercise it for a recognized purpose—here, to deter future illegal conduct by the marshals. *Id.* The United States Marshals service is "a bureau within the Department of Justice under the authority and direction of the Attorney General." 28 U.S.C. § 561. The marshals have the authority to act as sheriffs within a state, 28 U.S.C. § 564, to execute lawful writs, 28 U.S.C. § 566(c) and to "investigate" fugitive matters, 28 U.S.C. § 566(e)(1). The mar-shals are given no authority to abduct wanted persons from a foreign country. The governing statute provides that it is "the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals and the Court of International Trade." 28 U.S.C. § 566(a). When an agency whose primary mission is to obey our orders, and whose functions do not include overseas abductions, undertakes to kidnap from abroad a person for production in trial in a federal court, this action becomes our business. We are called to supervise cruel conduct designed to provide us with jurisdiction. We should not accept that jurisdiction except for one fact.

A decision of another federal court has broken the confinement caused by the abduction. After he was brought involuntarily to the United States, Matta was tried, convicted, and sentenced for various drug offenses; his conviction was affirmed in 1991. *United States v. Matta,* 937 F.2d 567 (11th Cir.1991). Matta's continued presence in the Central District of California is the result of that conviction.

At the time of this earlier conviction the United States was not a party to the Convention Against Torture And Other Cruel, Inhuman Or Degrading Treatment or Punishment, ratified in 1990, 136 Cong.Rec. S17491 (Oct. 27, 1990) and operative thirty days after its deposit by the President with the United Nations on October 21, 1994. Multilateral Treaties Deposited With The Secretary–General, UN Doc. No. 571 Leg/SER.E/13, IV.9 (1995). The relevance of the Treaty has not been argued in this court. The federal courts in the Eleventh Circuit were not asked to exercise their supervisory authority over the United States Marshals by dismissing the indictment; so this argument was waived. Matta was lawfully tried, convicted and imprisoned. He stands before us not as the victim of an abduction (which he once was) but as a lawfully-held prisoner. Accordingly, we need not dismiss the case.