

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2002

# USA v. Best

Precedential or Non-Precedential: Precedential

Docket No. 01-4321

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Best" (2002). *2002 Decisions.* Paper 580.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/580

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 18, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4321

UNITED STATES OF AMERICA,
Appellant

v.

ROBERT ALEXANDER BEST

On Appeal from the District Court of the Virgin Islands

District Court Judge: The Honorable Thomas K. Moore
(D.C. Crim. No. 01-cr-00202)

Argued on May 13, 2002

Before: AMBRO, FUENTES, and GARTH, Circuit Jud ges.

(Opinion Filed: September 18, 2002)

DAVID L. ATKINSON
United States Attorney

SARAH L. WEYLER (argued)
Assistant United States Attorney
Office of United States Attorney
5500 Veterans Drive, Suite 260
Charlotte Amalie
U.S. Virgin Islands 00802

Counsel for Appellant


DAVID J. COMEAUX (Argued)
Ogletree, Deakins, Nash, Smoak
 & Stewart
The Tunick Building, Suite 202
1336 Beltjen Road
St. Thomas, USVI 00802

Counsel for Appellee

OPINION OF THE COURT

FUENTES, Circuit Judge:

In this case, defendant Robert Best was seized by the Coast Guard from beyond the territorial sea of the United States and indicted for attempting to smuggle aliens into the country. We must decide whether Best, whose vessel was sailing under a Brazilian flag, may be tried in federal

district court even though the United States did not obtain Brazil's consent to intercept the foreign vessel and seize the defendant. The District Court entered an order dismissing the indictment, holding that the court lacked jurisdiction because the defendant had been seized in violation of international law. On appeal, the government contends that the court has the power to try the defendant despite any violations of international law.

Because it is well established that a court's power to try a defendant is ordinarily not affected by the manner in which the defendant is brought to trial, and because we conclude that no exceptions to this general rule apply here, in light of the facts surrounding the defendant's seizure, we will reverse the District Court's dismissal order and remand the case for trial.

I.

On May 16, 2001, the United States Coast Guard patrol boat "Nunivak" was patrolling the waters near St. Croix, U.S. Virgin Islands. That evening, the patrol boat spotted a large, wooden cargo vessel named the Cordeiro de Deus approximately sixteen nautical miles east of St. Croix. This

placed the vessel within the twenty-four nautical mile "contiguous zone" of the United States, but outside the country's territorial waters.1 According to the government, at the time the Coast Guard spotted the vessel on radar, the Cordeiro de Deus appeared to be on a standard smuggling route headed for St. John or St. Thomas. After the vessel failed to respond to several radio calls, an officer of the Nunivak formed a four-person boarding team and instructed it to contact the Cordeiro de Deus. He further instructed the boarding team to ask right of visit questions of the crew and to seek consent to board the vessel.

Traveling in a small, inflatable boat, the boarding team approached the starboard side of the Cordeiro de Deus and observed five men standing on that side of the deck. A member of the boarding team who was a Spanish interpreter asked the men questions in both English and Spanish, but determined that they spoke neither language. One of the crew members went inside the boat and came back with a small Brazilian flag. Because the interpreter knew that Portuguese is spoken in Brazil and that Spanish and Portuguese have many words in common, he communicated to the crew in Spanish and with hand signals.

The crew members understood that the Coast Guard sought to come aboard and indicated their permission for the boarding team to do so. Best was one of the five men standing on the deck of the Cordeiro de Deus and was identified by the other men as the captain of the vessel.

1. A nation's contiguous zone lies adjacent to its territorial seas. As explained by Presidential Proclamation 7219, "[i]nternational law recognizes that coastal nations may establish" these zones so as to "exercise the control necessary to prevent infringement of [their] customs, fiscal, immigration, or sanitary laws and regulations within [their] territory or territorial sea, and to punish infringement of the above laws and regulations committed within [their] territory or territorial sea." Presidential Proclamation No. 7219, 64 Fed. Reg. 48701 (Aug. 2, 1999). Under Article 24 of the Convention of the Territorial Sea and the Contiguous Zone, April 29, 1958, art. 24, 15 U.S.T. 1606, 516 U.N.T.S. 205, a nation's "contiguous zone may not extend beyond twelve miles from the baseline from which the breadth of the territorial sea is measured."

When asked about their destination and cargo, the men indicated that they were en route to Martinique to buy cigarettes and that their last port of call was Brazil. The boarding team also asked to inspect the vessel's documents. In response, the crew produced paperwork from Brazil and one document that contained a stamp from Suriname. The United States claims that the boarding team was unable to determine the nationality of the Cordeiro de Deus from these documents. The vessel bore no markings of a homeport.

The boarding team next began a safety inspection. During the inspection, two members of the boarding team discovered a group of Chinese nationals that appeared to be hiding in the cargo hold. The boarding team reported its findings to the Nunivak, which, after contacting Coast Guard authorities, was instructed to escort the Cordeiro de Deus close to St. Croix so that agents from the United States Immigration and Naturalization Service ("INS") could interview the individuals aboard the vessel. Two INS agents boarded the Cordeiro de Deus late the next afternoon and determined that there were thirty-three Chinese nationals on board. The next day, with the assistance of a Chinese interpreter, the INS agents interviewed the Chinese nationals. That afternoon, after transporting the Chinese nationals and all of the crewmembers to St. Croix, the agents interviewed Best and, on the following day, completed interviews with the other crew members.

On the morning of May 19, 2001, the government presented Best and four others for an advice of rights on the criminal charge of alien smuggling. A grand jury returned an indictment charging Best with conspiring to bring illegal aliens to the United States in violation of 8 U.S.C. S 1324(a)(1)(A)(v)(I) and bringing illegal aliens to the United States in violation of 8 U.S.C. S 1324(a)(1)(A)(i).2 On August 1, 2001, Best filed a motion to dismiss the indictment, arguing that the District Court lacked personal jurisdiction over him because the United States had taken

---

2. The government moved to dismiss the charges against two of the other defendants named in the original indictment. Another defendant named

in the original indictment pled guilty.

4

him from the high seas in violation of international law. The District Court agreed with Best, holding that the United States was required to obtain consent from Brazil under international law before it could seize Best from the Cordeiro de Deus and try him for violating the immigration laws. Because the United States failed to secure such consent, the court concluded that it lacked jurisdiction over Best and entered an order dismissing the indictment on October 26, 2001.

The government filed a motion for reconsideration on November 5, 2001 and a notice of appeal on November 21, 2001.3 Due to the filing of the notice of appeal, the District Court denied the government's motion for reconsideration for lack of jurisdiction on November 29, 2001.

II.

The District Court had subject matter jurisdiction over this case pursuant to 48 U.S.C. S 1612 and 4 V.I.C. S 32. We have appellate jurisdiction under 28 U.S.C. S 1291. Because whether the District Court properly dismissed the indictment for lack of jurisdiction is a question of law, we exercise plenary review. United States v. Ezeiruaku, 936 F.2d 136, 139 (3d Cir. 1991).

_____

3. Best contends that the government's appeal is untimely because, according to him, the notice of appeal was not "filed" until November 27, 2001, the date it was mailed to Best's counsel. Under 18 U.S.C. S 3731, the government may appeal from a district court order dismissing an indictment, as it did here. Under Fed. R. App. P. 4(b)(1)(B), the government's notice of appeal must be filed in the district court within 30 days after the filing of the order being appealed or the filing of a notice of appeal by any defendant. Because the government filed its notice of appeal on November 21, 2001, within the permissible 30 days, the government was timely in filing. Under Fed. R. App. P. 3(a), an appellant is obligated to provide its notice of appeal only to the district clerk, and not to any other parties. The district clerk then serves notice of the filing to all other parties pursuant to Rule 3(d). We also note that the government would have been timely had it waited 30 days after filing its motion for reconsideration to file its notice of appeal. See Government of the Virgin Islands v. Lee, 775 F.2d 514, 519 (3d Cir. 1985).

5

III.

At issue in this appeal is whether the District Court has personal jurisdiction over a defendant charged with violating the immigration laws and seized from a foreign vessel on the high seas. It is well established that a court's power to try a defendant is ordinarily not affected by the manner in which the defendant is brought to trial. See

Frisbie v. Collins, 342 U.S. 519, 522 (1952) (upholding conviction of defendant who had been kidnapped in Chicago by Michigan officers and brought to trial in Michigan); Ker v. Illinois, 119 U.S. 436, 444 (1886) (holding that court's power to try defendant for crime was not impaired by forcible abduction of defendant from Peru); see also United States v. Romero-Galue, 757 F.2d 1147, 1151 n.10 (11th Cir. 1985) (noting that "[j]urisdiction over the person of a defendant 'in a federal criminal trial whether citizen or alien, whether arrested within or beyond the territory of the United States,' is not subject to challenge on the ground that the defendant's presence before the court was unlawfully secured") (quoting United States v. Winter, 509 F.2d 975, 985-86 (5th Cir. 1975)). This general rule, commonly referred to as the Ker-Frisbie doctrine, "rest[s] on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." Frisbie, 342 U.S. at 522.

The Supreme Court explained in Frisbie that"[t]here is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." Id. In the years following Frisbie, however, it appeared increasingly difficult to reconcile the strict application of its rule with the expanded interpretation of due process expressed by the Court in later cases such as Mapp v. Ohio , 367 U.S. 643, 646 (1961), in which the Court held that due process requires application of the exclusionary rule in state prosecutions. In 1970, nearly two decades after Frisbie had been decided, we observed that the doctrine's validity "has been seriously questioned because it condones illegal police conduct." Gov't of Virgin Islands v. Ortiz , 427 F.2d 1043,

6

1045 n.2 (3d Cir. 1970). Four years later, the Second Circuit, citing the "erosion" of the Ker-Frisbie doctrine, carved out an exception to the general rule in United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974).

The defendant in Toscanino alleged that he had been forcibly abducted from Uruguay and tortured and interrogated over seventeen days at the behest of the United States government. Id. at 269-70. Concluding that the government's alleged conduct "shocks the conscience," id. at 273, the Second Circuit held that the Ker-Frisbie doctrine must yield to the requirements of due process and, accordingly, that a court must "divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." Id. at 275.

In United States ex rel. Lujan v. Gengler, 510 F.2d 62 (2d Cir. 1975), which the Second Circuit decided shortly after Toscanino, the court effectively limited its holding in

Toscanino to that case's shocking facts. In Lujan, a federal prisoner claimed that his due process rights had been violated under Toscanino because he had been forcibly abducted in Bolivia and then taken to New York. Id. at 63. Despite the fact that Lujan was forcibly abducted, the Second Circuit applied Ker-Frisbie and refused to order the district court to divest itself of jurisdiction, observing that "the government conduct of which [Lujan] complains pales by comparison with that alleged by Toscanino." Id. at 66. The court explained that "[l]acking from Lujan's petition is any allegation of that complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process."4 Id.

---

4. Specifically, the court noted that, unlike Toscanino, Lujan did not claim that he was knocked unconscious by a gun blow, that drugs were administered to subdue him during the flight to the United States, or that the United States Attorney was aware of his abduction or of any subsequent interrogation. Lujan, 510 F.2d at 66. Perhaps most importantly, Lujan "disclaim[ed] any acts of torture, terror, or custodial interrogation of any kind." Id.

7

Subsequent decisions of the Supreme Court indicate that there is reason to doubt the soundness of the Toscanino exception, even as limited to its flagrant facts. A year after Toscanino was decided, the Supreme Court generally reaffirmed the validity of the Ker-Frisbie doctrine, refusing to "retreat from the established rule that illegal arrest or detention does not void a subsequent conviction." Gerstein v. Pugh, 420 U.S. 103, 119 (1975). More recently, in United States v. Alvarez-Machain, 504 U.S. 655 (1992), the Court held that the rule of Ker-Frisbie was fully applicable to a case in which a Mexican national had been forcibly abducted, even though the abduction may have been "shocking" and in violation of general international law principles. Id. at 669-70. In light of these cases, it appears clear that the Ker-Frisbie doctrine has not eroded and that the exception described in Toscanino rests on shaky ground. United States v. Matta-Ballesteros, 71 F.3d 754, 763 (9th Cir. 1995) (observing that, "[i]n the shadow cast by Alvarez-Machain, attempts to expand due process rights into the realm of foreign abductions, as the Second Circuit did in [Toscanino], have been cut short"). Even more apparent is that the alleged circumstances surrounding the Coast Guard's seizure of the defendant in this case do not come close to resembling the "shocking governmental conduct" that the Second Circuit equated with a violation of due process in Toscanino. Accordingly, even if we were to adopt the Toscanino exception to Ker-Frisbie, it would not apply to the facts of this case.

A second possible exception to the rule of Ker-Frisbie, rooted in cases from the Prohibition era, relates to the violation of a treaty. In Ford v. United States , 273 U.S. 593 (1927), the Supreme Court distinguished Ker, explaining

that "the Ker case does not apply here" on the ground that "a treaty of the United States is directly involved." Id. at 605-06. Although the Court ultimately held that the defendants failed to raise timely the jurisdictional issue, the Court's dictum regarding Ker clearly indicated that "the rules may be quite different" when a treaty has been violated. United States v. Postal, 589 F.2d 862, 874 (5th Cir. 1979).

In Cook v. United States, 288 U.S. 102 (1933), a later Prohibition-era case involving the same treaty discussed in

Ford, the Supreme Court again acknowledged that the government may limit its own jurisdiction by entering into a treaty. In that case, the government seized the British vessel Mazel Tov outside the territorial seas of the United States and then brought suit against it. Id. at 108. Cook, as master and bailee of the Mazel Tov, argued that the trial court lacked jurisdiction to adjudicate rights in connection with the vessel because it was seized outside the territorial limits of the United States and in violation of a treaty with Great Britain. Id. The Court agreed, noting that the treaty in question fixed the conditions under which a vessel may be seized and taken for adjudication in accordance with the country's applicable laws. Id. at 121. Accordingly, it held that "[o]ur government, lacking power to seize, lacked power, because of the Treaty, to subject the vessel to our laws." Id. In so holding, the Court distinguished prior cases where forfeitures of vessels wrongfully seized by the Navy were upheld, explaining that those cases involved vessels of American registry and that "the seizures did not violate any treaty, but were merely violations of the law of nations because made within the territory of another sovereign." Id. at 122.

Interpreting the broader significance of Cook and Ford, the Fifth Circuit concluded that those cases "stand for the proposition that self-executing treaties may act to deprive the United States, and hence its courts, of jurisdiction over property and individuals that would otherwise be subject to that jurisdiction." Postal, 589 F.2d at 875 (emphasis added). In clarifying that not "every treaty to which the United States is a party acts to limit the jurisdiction of its courts," the court explained that "treaties affect the municipal law of the United States only when those treaties are given effect by congressional legislation or are, by their nature, self-executing." Id. (citing Whitney v. Robertson, 124 U.S. 190, 194 (1888); Foster v. Neilson, 27 U.S. (2 Pet.) 253, 311 (1829); Sei Fujii v. State, 38 Cal.2d 718 (1952); Dickinson, "Are the Liquor Treaties Self-Executing?" 20 Am.J.Int'l L. 444 (1926)). When a treaty is self-executing, "no legislation [is] necessary to authorize executive action pursuant to its provisions." Cook, 288 U.S. at 119.

This second exception to the Ker-Frisbie doctrine is buttressed by the more recent Alvarez-Machain case, in

which the Supreme Court observed that the Ker-Frisbie doctrine is inapplicable to cases where a person is forcibly abducted from a country in violation of an extradition treaty to which the United States is a party. 504 U.S. at 662. To defeat jurisdiction in such a case, the Eleventh Circuit observed that, under Alvarez-Machain, "a defendant must demonstrate, by reference to the express language of a treaty and/or the established practice thereunder, that the United States affirmatively agreed not to seize foreign nationals from the territory of its treaty partner." United States v. Noriega, 117 F.3d 1206, 1213 (11th Cir. 1997); see also United States v. Rezaq, 134 F.3d 1121, 1130 (D.C. Cir. 1998). However, the Ninth Circuit noted that, if a treaty does not specifically prohibit the abduction of foreign nationals, then it will not cause a court to be divested of jurisdiction over the abducted individual. Matta-Ballesteros, 71 F.3d at 762 (citing Alvarez-Machain, 504 U.S. at 664-66).

In this case, the District Court appears to have determined that it lacked jurisdiction over Best based loosely upon this second exception to the rule of Ker-Frisbie, although it did not make any explicit reference to the doctrine.5 Because the Coast Guard seized Best from a foreign vessel beyond the territorial sea of the United States, the District Court reasoned that the seizure was "subject to established international law of the high seas universally recognized by all civilized nations including the United States." Memorandum Opinion ("Mem.") at 12. Just as the Fifth Circuit in Postal held that the violation of a self-executing treaty divested the trial court of jurisdiction, the District Court here held that the violation of international law arising from the seizure of Best prevented it from exercising personal jurisdiction over the defendant. We disagree.

---

5. The court distinguished Alvarez-Machain  and other cases that discuss Ker-Frisbie on the ground that they did not involve an abduction from the high seas, but rather from another country or in violation of an extradition treaty. Mem. at 12. To the extent that the court meant to suggest that the Ker-Frisbie doctrine is wholly inapplicable to all forcible abductions of foreign nationals that take place on the high seas, we find no support for that position and we reject it.

As the Fifth Circuit observed in Postal, a defendant "cannot rely upon a mere violation of international law as a defense to the court's jurisdiction." 589 F.2d at 884. We find substantial support for that position in Supreme Court cases such as Alvarez-Machain and Cook , which both recognize that the rule of Ker-Frisbie is not muted when there is a "violation of general international law principles." Alvarez-Machain, 504 U.S. at 669; Cook, 288 U.S. at 122. Accordingly, we conclude that, unless the government's

seizure of Best was in violation of a treaty between the United States and Brazil, the District Court has jurisdiction over Best in spite of the potential violation of international law.

In its Memorandum Opinion, the District Court cited to the following provisions of three international treaties: Article 24 of the Convention of the Territorial Sea and the Contiguous Zone, April 29, 1958, art. 24, 15 U.S.T. 1606, 516 U.N.T.S. 205 ("Territorial Sea Convention");6 Article 22 of the Convention of the High Seas, April 29, 1958, art. 22, 13 U.S.T. 2312, 450 U.N.T.S. 82 ("High Seas Convention");7

_____

6. Article 24 of the Territorial Sea Convention provides:

   1. In a zone of the high seas contiguous to its territorial sea, the coastal State may exercise the control necessary to:

   (a) Prevent infringement of its customs, fiscal, immigration or sanitary regulations within its territory or territorial sea;

   (b) Punish infringement of the above regulations committed within its territory or territorial sea.

   2. The contiguous zone may not extend beyond twelve miles from the baseline from which the breadth of the territorial sea is measured.

   3. Where the coasts of two States are opposite or adjacent to each other, neither of the two States is entitled, failing agreement between them to the contrary, to extend its contiguous zone beyond the median line every point of which is equidistant from the nearest points on the baselines from which the breadth of the territorial seas of the two States is measured.

7. Article 22 of the High Seas Convention provides:

   1. Except where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on

11

and Article 33 of the United Nations Convention on the Law of the Sea, U.N.Doc. A/CONF.62/122 (1982), reprinted in 21 I.L.M. 1261-1354 (1982) ("UNCLOS").8 The court did not recognize, however, that Brazil is a party neither to the Territorial Sea Convention nor to the High Seas Convention. Furthermore, although UNCLOS was signed by the United States in 1994 and subsequently transmitted to the United States Senate, it has not been ratified by the Senate and, accordingly, does not have the force of law.9 Because none

_____

   the high seas is not justified in boarding her unless there is reasonable ground for suspecting:

   (a) That the ship is engaged in piracy; or

(b) That the ship is engaged in the slave trade; or

(c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.

2. In the cases provided for in sub-paragraphs (a), (b) and (c) above, the warship may proceed to verify the ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship, which must be carried out with all possible consideration.

3. If the suspicions prove to be unfounded, and provided that the ship boarded has not committed any act justifying them, it shall be compensated for any loss or damage that may have been sustained.

8. Article 33 of UNCLOS provides:

1. In a zone contiguous to its territorial sea, described as the contiguous zone, the coastal State may exercise the control necessary to:

(a) prevent infringement of its customs, fiscal, immigration or sanitary laws and regulations within its territory or territorial sea;

(b) punish infringement of the above laws and regulations committed within its territory or territorial sea.

2. The contiguous zone may not extend beyond 24 nautical miles from the baselines from which the breadth of the territorial sea is measured.

9. Under the Constitution, the President has the power to make treaties "provided two thirds of the Senators present concur." U.S. Const. art. II, S 2, cl. 2.

of these are treaties to which both Brazil and the United States are parties, the seizure of Best from the Cordeiro de Deus could not have been in violation of any of them. Thus, we find that the treaties cannot serve to limit the rule of Ker-Frisbie in this case.

Best maintains that, even in the absence of an applicable treaty between the United States and Brazil, the United States limited its own jurisdiction through Presidential Proclamation No. 7219, 64 Fed. Reg. 48701 (Aug. 2, 1999) ("Proclamation"), which the District Court described as being "expressly intended to bring federal criminal jurisdiction in line with accepted international law." Mem. at 17. The Proclamation, signed by President Clinton in 1999, provides, in relevant part:

The contiguous zone of the United States is a zone contiguous to the territorial sea of the United States, in which the United States may exercise the control necessary to prevent infringement of its customs,

> fiscal, immigration, or sanitary laws and regulations
> within its territory or territorial sea, and to punish
> infringement of the above laws and regulations
> committed within its territory or territorial sea.

Id. (emphases added). Best argues that the language of the Proclamation demonstrates that the government can only "punish" individuals found in the contiguous zone for the infringement of laws "committed within its territory or territorial sea." Because the Cordeiro de Deus never entered the territorial sea of the United States, he contends that he cannot be punished under the language of the Proclamation. Even if we were to agree with Best's interpretation of the above-quoted language, however, the Proclamation also states that "[n]othing in this proclamation amends existing Federal or State law[.]" Id. Accordingly, we must reject any suggestion that the Proclamation has an effect on the scope of the well-established rule of Ker-Frisbie.

IV.

Because the facts surrounding the seizure of the defendant in this case clearly do not place it within any

13

potential exceptions to the Ker-Frisbie doctrine, we conclude that the doctrine is fully applicable to this case. Thus, Robert Best, who was seized by the Coast Guard beyond the territorial waters of the United States aboard a vessel sailing under the Brazilian flag, may be tried in federal district court for the violation of United States immigration laws even though the government did not secure Brazil's consent to intercept the vessel and seize the defendant. We will therefore reverse the District Court's order dismissing the indictment and will remand the case for trial.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

14