**OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS OF G–I HOLDING, INC., Plaintiff,**

v.

**Samuel J. HEYMAN, Defendant.**

**No. 01 Civ. 8539(RWS).**

United States District Court, S.D. New York.

April 28, 2006.

Caplin & Drysdale, Chartered, by Elihu Inselbuch, of counsel, New York, NY, Caplin & Drysdale, Chartered, by Trevor W. Swett, Max C. Heerman, of counsel, Washington, DC, for Plaintiff.

Simpson Thacher & Bartlett, by Barry R. Ostrager, Mark Thompson, David J. Woll, Amanda T. Perez, of counsel, New York, NY, for Defendant.

Saiber, Schlesinger, Satz & Goldstein, by David R. Gross, William F. Maderer, Nancy A. Washington, of counsel, Newark, NJ, Keating, Muething & Klekamp, by Kevin E. Irwin, Michael L. Scheier, of counsel, Cincinnati, OH, for Plaintiff the Legal Representative of Present and Future Holders of Asbestos–Related Demands.

## OPINION

SWEET, District Judge.

The plaintiffs Official Committee of Asbestos Claimants of G–I Holdings, Inc., suing on behalf of the Chapter 11 Bankruptcy Estate of G–I Holdings, Inc. f/k/a GAF Corporation, et al. ("The Committee") has moved to discover certain communications which have been withheld by the defendants Samuel J. Heyman ("Heyman"), G–I Holdings Inc. ("G–I"), and International Specialty Products, Inc. ("ISP") on the grounds of attorney-client and work-product privileges.

As will soon become evident, this motion is part of a hard-fought and interrelated litigation which has included the G–I bankruptcy proceeding in the United States District Court for New Jersey, No. 01–30135(RG), and this Court. For the reasons set forth below, the motion is granted in part and denied in part.

### Prior Proceedings

In January 2001, G–I filed for voluntary reorganization under Chapter 11 of the Bankruptcy Code in the face of massive asbestos liabilities. Its bankruptcy case is ongoing before the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). The Committee was appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1). Its members are individuals who assert damage claims against G–I for asbestos-related bodily injuries or death.

The Committee was appointed by the Bankruptcy Court on May 14, 2001, "to pursue and prosecute any and all claims and causes of action belonging to the Debtor and/or its estate against Samuel Heyman and his affiliates arising out of the transfer of the stock of International Specialty Products, Inc. and/or ISP Holding, Inc., including any claims or causes of action pursuant to Section 544(b) of the United States Bankruptcy Code." *In re G–I Holdings, Inc. f/k/a GAF Corporation,* No. 01–30135(RG). This transfer has been characterized by the Committee as the Spin-off.

On September 20, 2001, the Committee filed its complaint in this Court. Heyman moved to dismiss the complaint, which motion was denied in an opinion of April 8, 2002 (the "April 8 Opinion"). *Official Comm. of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 01 Civ. 8539(RWS), 2002 U.S. Dist. LEXIS 6187 (S.D.N.Y.). The authority of the Bankruptcy Court to delegate a trustee's role to a creditors' committee became an issue litigated in the Third Circuit. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 304 F.3d 316 (3d Cir.2002), *vacated,* 310 F.3d 785 (3d Cir. 2002), *rehearing en banc,* 330 F.3d 548 (3d Cir.2002).

After the resolution of its status, the Committee moved to amend its complaint which motion was granted by an order and opinion of June 6, 2005 (the "June 6 Opinion"). *See Official Comm. Of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 01 Civ. 8539(RWS), 2005 U.S. Dist. LEXIS 10757 (S.D.N.Y.). The first amended complaint ("FAC") was filed on

June 23, 2005 alleging a fraudulent conveyance arising out of a series of events ranging from transactions initiated in 1996.

The FAC has stated a series of claims to avoid the Spinoff and to recover the ISP stock under 11 U.S.C. §§ 544(b) and 550, based on state law fraudulent conveyance theories. It alleges that the Spin-off constituted a constructively fraudulent transfer on several alternative grounds: (a) G–I was insolvent, or rendered insolvent, when the ISP stock was gratuitously transferred to the insiders, (Count I); (b) the Spin-off left G–I with an unreasonably small capital for its business, (Count II); and (c) at the time of the Spin-off, G–I knew or reasonably should have known that it was incurring debts, including asbestos liabilities, beyond its ability to pay as they became due, (Count III). Additionally, it alleges that Heyman and G–I carried out the Spin-off with actual intent to hinder, delay, and defraud asbestos claimants by placing the value of ISP beyond their reach, (Count IV). Finally, the FAC asserts that by stripping G–I of ISP for his own enrichment, Heyman breached his fiduciary duty to G–I and caused G–I to breach its own fiduciary duty to creditors, (Counts VI and VII).

Discovery schedules were determined in response to the Committee's document requests under Rule 34, Fed.R.Civ.P., and Heyman produced certain documents in April 2005.

ISP's amended privilege log, dated February 14, 2005, and two supplements thereto, consists of 48 pages and list 433 documents objecting to 37 of the Committee's 52 document demands on the basis of attorney-client privilege.

G–I provided three privilege logs, one for itself, another for documents held by its counsel, Weil Gotshal & Manges, and one for Robert Poyourow, an in-house attorney. Together these logs consist of 27 pages and list 341 documents withheld on the basis of attorney-client privilege. The meet and confer process was not completed and the instant motion was heard and marked fully submitted on December 7, 2005.

*The Facts As Alleged*

The following background facts relating to GAF's asbestos liabilities and the events surrounding the asbestos claims are set forth in the FAC. These events are described in the FAC ¶¶ 45–50 and are described also in the Committee's memorandum of law in support, pp. 3–8, and these allegations are summarized hereafter.

In 1996 G–I was a party to a proposed class action settlement of future asbestos claims against members of the Center for Claims Resolution, Inc. ("CCR"), which sought to process, defend, and resolve asbestos claims. *See Georgine v. Amchem Prods., Inc.,* 157 F.R.D. 246, 257 (E.D.Pa. 1994), *vacated,* 83 F.3d 610 (3d Cir.1996), *aff'd,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Known as the *Georgine* Settlement, it was proposed to take future asbestos claims against CCR members out of the courts and channel them into a private system for processing and payment for at least ten years, which would have altered the rules and practices of resolution of such claims up to that time. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 604–05, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In 1992, based on an estimate of what its payment obligations would be over the ten-year term of the *Georgine* Settlement, G–I took a charge of $322.5 million against earnings and established an unfunded accounting reserve for asbestos claims in that amount, net of anticipated insurance recoveries. *See* G–I Holdings, Annual Report (Form 10–K) (1992). According to the Committee, calculations made by G–I in September 1993 show that its total estimated lia-

bility under the *Georgine* Settlement and arrangements then in place for resolving pending claims was just under $700 million ($649.4 million for pending and future claims plus $43.8 million in administrative expenses), of which only $348.9 million was expected to be covered by insurance.

After a fairness hearing, the *Georgine* trial court approved the settlement and certified the class in August 1994. *Georgine*, 157 F.R.D. at 315. Shortly thereafter, that court entered a preliminary injunction barring class members from initiating or maintaining suits against CCR members based on asbestos injuries. *Georgine v. Amchem Prods., Inc.*, 878 F.Supp. 716 (E.D.Pa.1994). On May 10, 1996, the Court of Appeals for the Third Circuit rejected the *Georgine* Settlement. *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir.1996). According to the Committee, within a month of that decision, G–I management met with auditors and outside counsel to plan the transactions to be completed by January 1, 1997, which are now sought to be avoided.

On June 24, 1997, the Supreme Court issued its opinion affirming the Third Circuit's decision and refusing to reinstate the settlement. *See Amchem*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689. According to the Committee, G–I then sought to change existing law and achieve the goals of the *Georgine* Settlement by legislation. In August 1997 the trial court dissolved the preliminary injunction in *Georgine* and asbestos claims against G–I followed.

On January 1, 1997, G–I divested itself of at least 80, 500, 000 shares of the stock of ISP, its chemicals subsidiary, by way of a distribution to G–I's shareholders. As the 96% shareholder of G–I, Heyman received in the Spin-off, directly or indirectly, an equivalent percentage interest in the asset transferred, consisting of stock in ISP Holdings, the direct parent of ISP. About a year later, ISP and ISP Holdings merged, and Heyman and certain Heyman family entities controlled by him obtained direct ownership of the bulk of ISP's own stock. (Heyman's Answer to FAC, ¶ 33).

In its Form 10–K for 1996, ISP described the Spin-off as part of a series of "Separation Transactions" and emphasized that ISP Holdings and ISP were "no longer direct or indirect subsidiaries" of G–I. ISP managed G–I and affiliated companies under a management agreement that, as amended from time to time, has remained in place since 1989. Throughout that period, the senior executives of G–I, including its president, chief financial officer, and general counsel, have been employees of ISP who have rendered services to G–I under the Management Agreement in exchange for a management fee. Heyman has been chairman of ISP at all relevant times.

### The Issues

The Committee seeks to overrule the asserted privileges on three grounds. First, it contends that the holding in *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), that corporate insiders may not withhold information from a bankruptcy trustee of their corporation under claim of privilege should apply here to the duly-authorized creditors committee.

Second, the Committee contends that the fiduciary exception set forth in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), should apply to defeat the exercise of the attorney-client privilege by the corporation.

Third, according to the Committee, the fraud exception to the attorney-client privilege and work product doctrine, should apply here because the case involves

fraudulent conveyance. *See, e.g., In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1038–42 (2d Cir.1984); *In re Andrews,* 186 B.R. 219, 222 (Bankr.E.D.Va.1995).

According to the Defendants, these contentions go beyond the limits previously established for such exceptions. For reasons set forth below, the *Garner* exception is held to apply and the *Weintraub* and crime fraud exception do not.

One initial issue does not appear to be in conflict, the choice of law relating to privilege issues. Under Fed.R.Evid. 501, the issue of privilege is to be determined in accordance with state law insofar as state law "supplies the rule of decision." In *G–I Holdings, Inc. v. Baron & Budd,* No. 01 Civ. 0216, 2005 WL 1653623, of *2 (S.D.N.Y. July 13, 2005), this Court noted that a federal court sitting in diversity should apply the conflicts rules of the forum state to state law claims, and that, with respect to issues of evidentiary privilege, New York courts apply the law of the place where the evidence in question will be introduced, or the location of the discovery proceeding. This Court also has recognized, however, that where, as here, a federal court is exercising bankruptcy jurisdiction, it may be unclear whether state law or federal law provides the relevant rules for resolving conflicts of law. *See Official Comm. of Asbestos Claimants of G–I Holdings, Inc. v. Heyman,* 277 B.R. 20, 29–30 (S.D.N.Y.2002). In *In re Gaston & Snow,* 243 F.3d 599, 605–07 (2d Cir. 2001), the Second Circuit applied state choice of law rules in a bankruptcy controversy, but recognized that federal conflicts principles will apply where a "significant federal policy" is implicated. In such cases, those issues must be determined under federal law.

The fiduciary and fraud exceptions to privilege operate under both federal law and the law of New York (the state where the discovery and evidentiary proceedings will take place) and no material conflict between federal law and New York law has been noted with respect to these exceptions. "[W]hen the forum state is New York, 'a court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict.' " *G–I Holdings, Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 249 (S.D.N.Y.2000) (quoting *Simon v. Philip Morris, Inc.,* 124 F.Supp.2d 46, 70 (E.D.N.Y.2000)). Therefore, with respect to those issues, it is concluded that New York law shall apply.

### The Committee Does Not Achieve The Authority Of The Weintraub Trustee

According to the Committee, upon the bankruptcy of G–I, its rights, including its rights as to the exercise of the attorney-client privilege, flowed to the estate, and therefore, under the principles of *Weintraub,* the privilege must be waived. However, it is concluded that because the Committee and a trustee do not have identical powers and duties, the contention fails.

According to the Committee, bankruptcy shifts control over the privilege from the officers and directors to a bankruptcy fiduciary. (Committee Memo in Support, p. 18). The Committee notes the statement in *Weintraub* that "the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications." *Weintraub,* 471 U.S. at 358, 105 S.Ct. 1986.

According to the Committee, the inherent conflict presented to the debtor in possession requires it to waive the exercise of the privilege as the trustee in *Weintraub* was so required. The Committee has delineated this conflict aptly (Committee Memo in Support, p. 56). Here, after the authority of the Committee, duly ap-

pointed, became subject to challenge in the Third Circuit as described above, the Committee applied to the Bankruptcy Court for the appointment of a Chapter 11 trustee based, among other things, on the conflict of interest facing G–I as the debtor in possession by reason of Heyman's alleged control of the company and his status as a defendant to the instant action on behalf of the debtor's estate. G–I opposed that application. The Bankruptcy Court denied the application, *see In re G–I Holdings, Inc.,* 295 B.R. 502 (D.N.J.2003), and the Third Circuit in affirming concluded that the interests of the estate could be fully protected without ousting incumbent management. *See In re G–I Holdings, Inc.,* 385 F.3d 313, 317, 321 (3d Cir.2004).

To establish its claim of conflict, the Committee has cited the following statement of counsel to G–I made in the course of the hearing,

If G–I, the debtor in possession, commenced an action against Mr. Heyman to retrieve the ISP stock from him, we would have the situation where Mr. Heyman, as the control person of G–I, is giving directions to its attorneys as plaintiff; and Mr. Heyman, as defendant, is giving directions to his attorneys as defendant.

I think it's an understatement to say that is not going to happen.

Exh. 14 at 25–26 (February 9, 2001 Hearing Tr.)

The Committee contends that in corporate reorganizations where no actual Chapter 11 trustee is appointed, the debtor itself takes on the role of a trustee as "debtor in possession" and usually litigates "avoidance power" claims on behalf of its estate and creditors as part of its fiduciary duty. In support of this proposition, the Committee cites 11 U.S.C. § 1107(a) (providing that the debtor in possession "shall perform all the functions and duties ... of

a trustee") and 7 Collier on Bankruptcy ¶ 1100.08 at 12100–21, 1100–24 (15th ed.2005).

However, acknowledging that G–I as debtor in possession has fiduciary duties to its estate, including creditors, and that a conflict exists between the interests of the Committee and the Defendants, does not resolve the *Weintraub* issue.

According to the Defendants, subsequent courts applying *Weintraub* have held that control of the attorney-client privilege turns on who retains managerial control of the corporation, as in the following statement, "The principle of *Weintraub,* therefore, is that invoking or waiving a corporation's privilege is an incident of control of the corporation." *In re Grand Jury Subpoenas 89–3 and 89–4,* 734 F.Supp. 1207, 1211 (E.D.Va.1990).

No authority has been cited to extend a trustee's power to a creditor's committee. The Committee did cite *In re Boileau,* 736 F.2d 503 (9th Cir.1984), as a case where the court extended the *Weintraub* principle beyond trustees and found that an examiner is "entitled to control the assertion or waiver of the privilege." However, the parties not only stipulated to the appointment of an examiner in lieu of a trustee, but further stipulated that, in contrast to the conventional bankruptcy situation, both the creditors' committee and the examiner were "empowered to perform a myriad of functions normally carried out by a trustee," and the debtor was "removed from any substantial participation in the management" of the company such that it "retain[ed] no authority to assert the corporate attorney-client privilege." 736 F.2d at 506. The Ninth Circuit's finding that the "waiver authority resided in the examiner" was based not on a general extension of the *Weintraub* principle to examiners, but rather the recognition that the examiner in that case was actually a

trustee-like entity, appointed on consent, that fit within the preexisting mold created by *Weintraub*. *Id.* The *Boileau* court acknowledged that its holding "is not a ruling on the authority of an examiner to waive the attorney-client privilege" and that it was not aware of any case law so extending *Weintraub*. *Id.* at 505–06.

■ The Committee creditors have no responsibility or authority to operate or manage the debtor corporation and, of course, represent a particular class of creditors, here, tort claimants. *See, e.g., In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D.Minn.1981) ("[A creditors' committee] is purposely intended to represent the necessarily different interests and concerns of the creditors it represents. . . . The committee as the sum of its members . . . will aid, assist, and monitor the debtor pursuant to its own self-interest."). As a result, the Committee owes a duty only to its constituent creditors. *See Official Comm. of Unsecured Creditors of Grand Eagle Cos., Inc. v. ASEA Brown Boverie, Inc.*, 313 B.R. 219, 224 (N.D.Ohio 2004) ("A trustee acts for the benefit of the estate and owes a fiduciary duty to all creditors of the estate. In contrast, a committee of unsecured creditors is a fiduciary only to the creditors it represents. . . . A creditors' committee need not consider the best interests of the estate.") (citations omitted).

The hostility of the interests of asbestos claimants and of G–I over time have been presented by Heyman forcefully (Heyman Memo in Opp., pp. 8–15), reaching an unsupported apogee that the Committee's pursuit of 11,000 phony claims against G–I based on fabricated medical evidence does not qualify it to serve as a "bankruptcy trustee." (Heyman Memo in Opp., p. 15).

To blunt this contention, the Committee notes that its purpose, to recover substantial sums from Heyman and his entities, will benefit not only G–I but its estate.

Conceding that generally, a creditors' committee owes a duty only to its constituency, the Committee contends that the relief it seeks brings it within the scope of *Weintraub* and requires the court to compel waiver of the attorney-client privilege. However, because the interests of a trustee and a creditors' committee are not in this instance entirely congruent, it is not appropriate to extend the *Weintraub* principle beyond its stated scope.

### The Garner Exception Applies

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970) involved a shareholders' derivative suit charging senior executives of a corporation with a failure to fulfill fiduciary responsibilities. Management refused to turn over to ·the shareholder-plaintiffs certain communications with corporate counsel. Before the Fifth Circuit, plaintiffs argued that management had no right whatsoever to assert privileges against stockholders, while management contended that it had an "absolute" right to do so. *Id.* at 1097.

The *Garner* court sought to balance the opposing interests in discovery and confidentiality. 420 F.2d at 1101–02. The court observed that "management does not manage for itself," but rather has "duties which run to the benefit ultimately of the stockholders," *id.* at 1101, and concluded, "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of these interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.* at 1103–04. *See Garner v. Wolfinbarger*, 56 F.R.D. 499 (S.D.Ala.1972) (on remand) (overruling corporate privilege claims).

*Garner* has been accepted by state and federal courts, and has not been limited to shareholder derivative suits. *See Stenovich v. Wachtell, Lipton, Rosen & Katz,* 195 Misc.2d 99, 756 N.Y.S.2d 367, 380 (N.Y.Sup.Ct.2003); *see also In re Bairnco Corp. Sec. Litig.,* 148 F.R.D. 91, 97 (S.D.N.Y.1993); *Geissal v. Moore Med. Corp.,* 192 F.R.D. 620 (E.D.Mo.2000) (ERISA administrators and beneficiaries); *In re Estate of Baker,* 139 Misc.2d 573, 528 N.Y.S.2d 470 (N.Y. Surrogate's Ct.1988) (estate and beneficiaries); *Quintel Corp., N.V. v. Citibank, N.A.,* 567 F.Supp. 1357 (S.D.N.Y.1983) (bank acting as fiduciary in real estate transaction); *Hoopes v. Carota,* 142 A.D.2d 906, 531 N.Y.S.2d 407 (N.Y.App.Div.1988) (trustees and beneficiaries of a trust) *aff'd,* 74 N.Y.2d 716, 544 N.Y.S.2d 808, 543 N.E.2d 73 (1989); *see also* Attorney–Client Privilege § 8:23 at 130 ("Courts have begun to extend the balancing of interests approach to conflicting interests claims in a variety of fiduciary contexts").

Lower courts in the Second Circuit, including this Court, have applied the fiduciary exception. *See, e.g., RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* No. 94 Civ. 5587, 2003 WL 41996, at *4 (S.D.N.Y. Jan. 6, 2003) (citing cases applying the exception). Although the Second Circuit has not expressly adopted the exception, it has remarked that, in a proper case, "grounds may exist for disclosure of [ ] communications ... [by] application of the shareholder 'good cause' exception to the attorney-client privilege announced in *Garner.*" *In re Dow Corning Corp.,* 261 F.3d 280, 286 (2d Cir.2001). This Court has noted, as have other courts, that the· *Garner* doctrine has become a general "fiduciary exception" to the attorney-client privilege. *Asian Vegetable Research and Dev. Ctr. v. Inst. of Int'l Educ.,* 94 Civ. 6551, 1995 WL 491491, at *5 (S.D.N.Y. Aug. 17,

1995). According to the *Stenovich* court, the exception:

> may apply when there is a fiduciary relationship between the party seeking disclosure and the party who sought legal advice for the party seeking disclosure. It applies because of the nature of the relationship and not because of the context in which that relationship arose. Although the exception is not absolute, it has been applied to a variety of relationships that are fiduciary in nature.

756 N.Y.S.2d at 380.

Under the *Garner* analysis, "good cause" must be established to overcome the asserted privileges. The *Garner* court set forth a detailed nine-item list of considerations relevant to the good cause inquiry. *See* 430 F.2d at 1104. For "simplicity of analysis," the court in *In re Pfizer Inc. Sec. Litig.,* No. 90 Civ. 1260, 1993 WL 561125, at *13 (S.D.N.Y. Dec. 23, 1993), grouped the *Garner* factors into four broad categories: "(1) the discovering party's stake in the fiduciary relationship; (2) the apparent merit of the claim; (3) the need of the discovering party for the information; and (4) the nature of the communication itself."

### 1. *The Discovering Party's Stake In The Fiduciary Relationship*

▮ In *Pfizer,* a shareholders' action, this factor weighed heavily in favor of abrogation of the privilege because it was "clear that plaintiffs represent a substantial percentage of both shareholders and shares." *Id.,* at *13. Here, the Committee contends that it represents G–I's entire bankruptcy estate because it seeks as successor to G–I corporate entity to enhance that estate by setting aside the transfers described above, and because it is the beneficiary of the fiduciary duties owed by G–I's management, including Heyman and ISP. Where the party seeking discovery

seeks to recover on behalf of the corporation, rather than on behalf of individual shareholders or claimants, courts bring a lesser degree of scrutiny to bear in determining whether good cause exists. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 WL 41996, at *4 n. 13 (S.D.N.Y. Jan. 6, 2003) (citing, *inter alia, Ward v. Succession of Freeman*, 854 F.2d 780, 786–87 (5th Cir.1988); *Fausek v. White*, 965 F.2d 126, 130–31 (6th Cir.1992); *In re IBM Corp. Sec. Litig.*, No. 92 Civ. 9076, 1993 WL 760214 (S.D.N.Y. Nov. 30, 1993)); *see also Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480, 484 n. 4 (E.D.Pa. 1978) ("Where unanimity or substantial unanimity [of stockholders] exist[s] ... the *[Garner]* court suggest[ed] that the attorney-client privilege would be immediately overcome without further inquiry into other elements of good cause." (citing *Garner*, 430 F.2d at 1101)).

The conflict between the interest of G–I and its estate and the Defendants is conceded and established as set forth above.

### 2. *The Apparent Merit Of The Claim*

■ As in *Bairnco*, the Committee's allegations "are of colorable merit," as evidenced by the fact that the claims "have withstood a motion to dismiss." 148 F.R.D. at 99.

At this early stage the merit of the claims asserted in the FAC remain contested. Indeed, the discovery sought is necessary to initiate a resolution of that contest.

### 3. *The Need Of The Discovering Party For The Information*

■ The Committee has a substantial need to discover the information withheld, for the purposes both of proving its claims and rebutting Heyman's affirmative defenses, such as his assertion that the Spin-off was carried out in good faith and for valid business reasons. According to the Committee, the information sought is available from no other sources.

### 4. *The Nature Of The Communication Itself*

The Defendants do not directly address the nature of the communications. It should be noted that the meet and confer process with respect to the submitted privilege logs has not been completed. When it has, perhaps specific objections can be presented.

On balance, the *Pfizer* factors establish good cause to set the attorney-client privilege aside. Because the *Garner* fiduciary exception has been extended to plaintiffs analogous to the Committee and because of the obvious and irreconcilable conflict presented to G–I by the Committee's claims, it is appropriate to apply the *Garner* exception and require G–I to produce its documents withheld on the basis of the attorney-client privilege.

A subsidiary issue is presented by the claim of the Committee that the disposition of the G–I privilege is controlling for ISP as well. The *Garner* exception to the attorney-client privilege results from the particular dynamics of G–I's fiduciary duties in the context of bankruptcy and its demonstrated conflict of interest, factors which do not extend to ISP.

According to the Committee, because in-house lawyers employed by ISP provided legal services to G–I under a management agreement, ISP's privilege belongs to G–I. The Amended and Restated Management Agreement between G–I and ISP provides:

> The Company [defined in the preamble to mean ISP] agrees to provide to ... the Corporate Entities [defined in the preamble to include GAF and G–I], to the extent required by each of them, the following management services ...,

which shall be rendered on a continuous basis without specific request: ... (iii) Legal and corporate secretarial services; ..." The services provided by ISP to GAF and G–I under this agreement also include "[g]eneral management," and "financial services, including insurance management, accounting ... and tax services."

Exhibit 4, p. 2.

Courts have held that formal management agreements for the provision of legal services do not preclude the companies from maintaining separate and independent identities. *See, e.g., id.* (management agreement for provision of legal and other services not enough to "expose the parent corporation to liabilities for its subsidiary's acts"); *Phillips v. J.P. Stevens & Co.*, No. 3:92 Civ. 00094, 1995 WL 794200, at *7 (M.D.N.C. May 1, 1995) (management agreement whereby parent company "agreed to provide 'legal advice and services' and 'human resources and personnel advice and services'" to subsidiary not enough to hold parent liable for actions of subsidiary); *see also Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1378–79 (10th Cir.1980) (despite existence of management agreement whereby parent provided managerial services to subsidiary, court refused "to treat the parent and subsidiary as one" and "disregard the corporate entity of the two corporations"). As such, ISP retains the privilege over any communications that were made subsequent to the 1997 transactions.

In *In re Financial Corp.*, 119 B.R. 728, 737 (Bankr.C.D.Cal.1990), the trustee of a debtor parent company sought the privileged records of a former subsidiary, claiming that when the companies had a parent-subsidiary relationship, the parent "had access to the records of [the subsidiary], and since [the parent] and [subsidiary] shared officers, directors, and counsel, communications between [the subsidiary] and its counsel were never intended to be confidential as to [the parent]." The court, however, found that such "intermingling" was not sufficient to defeat the subsidiary's assertion of privilege against its former parent. *Id.* Instead, the court held that privileged communications "do not lose their privileged character as a matter of law," *id.,* simply because they are disclosed to counsel that represents both parent and subsidiary companies.

■ Where counsel represents multiple clients, that counsel cannot be forced to divulge to one client the privileged communications shared with counsel by another client. *See, e.g., In re Sage Realty Corp.*, 91 N.Y.2d 30, 666 N.Y.S.2d 985, 989, 689 N.E.2d 879 (1997) ("[An attorney] ... should not be required to disclose documents which might violate a duty of nondisclosure owed to a third party."); *In re White*, 42 B.R. 494, 499 (Bankr.E.D.N.Y. 1984) ("[A]n attorney is prohibited from divulging confidential communications in the absence of a waiver by his client."); *Timken Roller Bearing Co. v. United States*, 38 F.R.D. 57, 64 (N.D.Ohio 1964) ("Once established, [the attorney-client privilege is] inviolate except by waiver of the possessor. Thus only the client can unseal his attorney's lips."). Here, the management agreement does not destroy the corporate form and require ISP to withdraw its claim of privilege.

### The Crime Fraud Exception Does Not Apply

The Committee has cited Justice Cardozo in asserting that the crime fraud exception should be applied to its motion:

There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an

attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told.

*Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *see also Bairnco*, 148 F.R.D. at 100.

■ The Committee appropriately has observed that the fraud exception applies in fraudulent transfer cases and in "the bankruptcy context." *In re Andrews*, 186 B.R. 219, 222 (Bankr.E.D.Va.1995); *see United States v. Barrier Indus., Inc.*, No. 95 Civ. 9114, 1997 WL 16668 (S.D.N.Y. Jan. 17, 1997) (applying the exception in a fraudulent transfer case); *In re Warner*, 87 B.R. 199, 201–03 (Bankr.M.D.Fla.1988) (same). The issue presented here is the showing necessary to establish the application of the exception.

■ The Second Circuit has held that the crime fraud exception to the attorney-client privilege is a limited exception that applies where two distinct requirements are met. There must be a "showing of probable cause to believe that [1] fraud or crime has been committed and [2] that the communications in question were in furtherance of the fraud or crime." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). Heyman has cited *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir.1996) ("Mere allegations or suspicion ... are insufficient ... to justify application of the crime-fraud exception."); *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir.1987) ("[M]ere allegations of criminality are insufficient to warrant application of the exception."); *In re College Landings Ltd. P'ship*, 248 B.R. 619, 623 (Bankr.M.D.Fla.1998) ("Mere allegations or suspicions of fraud are not enough" to invoke the fraud exception); *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933) ("It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.") (quotation marks and citation omitted).

■ This Court has held that the fraud exception comes into play when "a prudent person would have a reasonable basis to communications were in furtherance thereof." *Asian Vegetable Research*, 1995 WL 491491, at *5 (citing *In re Grand Jury Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir.1984)).

Both sides of this issue of the quantum of proof rehearse their views of the underlying charges—the Committee in eighteen pages (Committee Memo in Support, pp. 34–52), and Heyman in eight pages (Heyman Memo in Opp., pp. 42–50). The determinations necessary to establish probable cause, most of them factual, cannot be made in this context and on this record as it now stands. The sufficiency of the FAC from a pleading perspective does not "equate with an affirmative showing of a prima facie case for purposes of defeating the attorney-client privilege." *In re Taxable Mun. Bonds Litig.*, Civ. A. MDL No. 863, 1993 WL 390145, at *1 (E.D.La. Sept. 24, 1993).

The effect of the *Georgine* settlement and its rejection and the ensuing claims of asbestos injury are subject to widely differing views, as the parties' submissions demonstrate. The issues also lie at the heart of the present controversy. Accordingly, the Committee has not established the facts necessary to compel the legal conclusion that there is probable cause that a fraudulent transfer took place.

### Conclusion

The meet and confer process will be completed with respect to the privileges asserted by G–I. G–I documents will be produced in accordance with this opinion with leave granted to G–I to make any

further applications with any unresolved issues.

It is so ordered.